*In re* ESTATE OF HELEN WEILAND, Deceased (Madeline Baurhyte *et al.*, Claimants-Appellees, v. Genevieve Smith *et al.*, Respondents-Appellants (The People *ex rel.* James E. Ryan, Attorney General of the State of Illinois, Claimant-Appellee; Albert S. Salvi, as Ex'r of the Estate of Helen Weiland, Respondent-Appellant)).

Second District    No. 2—01—1384

Opinion filed April 25, 2003.

Michael J. Salvi, of Salvi, Salvi & Wifler, of Lake Zurich, for appellants Albert S. Salvi and Genevieve Smith.

Lisa Madigan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Timothy K. McPike, Assistant Attorney General, of counsel), for appellee People *ex rel.* James E. Ryan.

David M. Lutrey and Robert M. Bollman, both of Bollman & Lesser, of Lake Forest, and Bonnie Spaccarelli Hannon, of Barrington, for other appellees.

JUSTICE GROMETER delivered the opinion of the court:

The present appeal involves the status of three bank accounts established by Helen Weiland, now deceased. The People of the State of Illinois *ex rel.* James E. Ryan, Attorney General of the State of Illinois, filed a claim against respondent Albert S. Salvi, the executor of Weiland's estate. Madeline Baurhyte, Robert Baurhyte, Glen Baurhyte, Timothy Baurhyte, and Michaeline Smith (the Baurhyte claimants) filed a separate claim naming as respondents Genevieve Smith, Salvi, and Weiland's estate. The State and the Baurhyte claimants alleged that the three bank accounts were payable-on-death (POD) accounts and that the accounts were improperly liquidated by Weiland's guardian after Weiland was adjudged disabled but before her death. Respondents disputed these allegations. Following a consolidated bench trial in the circuit court of Lake County, the trial court determined that all three accounts were payable-on-death accounts and that they were improperly liquidated. Respondents timely appealed.

On December 30, 2002, this court filed its opinion. We affirmed in part and reversed in part. Specifically, we reversed that portion of the trial court's ruling that one of Weiland's bank accounts was a POD account naming the Baurhyte claimants as beneficiaries. The basis for our decision was that the trial court applied the wrong standard of proof in assessing the Baurhyte claim. The Baurhyte claimants filed a timely petition for rehearing disputing our finding. We granted the petition for rehearing and withdrew our prior opinion. For the reasons that follow, we adhere to our finding that the trial court applied the wrong standard of proof. Accordingly, we affirm the decision of the trial court in part and reverse in part.

## I. BACKGROUND

### A. The Bank Accounts

The present dispute centers on three bank accounts established by Helen Weiland. Weiland opened account No. 0452085723 (5723) at Affiliated Bank on January 3, 1991. Early in the nineties, Comerica Bank acquired Affiliated Bank. On February 17, 1994, following the

acquisition, Weiland opened account Nos. 0453024168 (4168) and 0453024218 (4218) at Comerica Bank. Sometime later, La Salle Bank acquired Comerica Bank. Account No. 5723 is the subject of the claim brought by the Baurhyte claimants; account Nos. 4168 and 4218 are the subjects of the claim brought by the State.

## B. Liquidation of Accounts

In July 1997, Weiland, then 92, was adjudged disabled. Joseph Vogler, the public guardian of Lake County, was named guardian of Weiland's person and estate. Weiland was then placed in a nursing home. Vogler was succeeded by Weiland's sister, Genevieve Smith. Smith hired attorney Albert Salvi, Sr., to represent her in the administration of Weiland's estate.

On May 22, 1998, Salvi closed account No. 5723 and deposited the funds into an account held in the guardian's name. In June 1998, Salvi petitioned the circuit court of Lake County to revoke 11 other bank accounts held by Weiland at La Salle Bank. Salvi believed that the bank accounts were POD accounts, also known as Totten trusts. A Totten trust is created when a deposit is made by a person (the holder) of his or her own money in his or her own name as trustee for another. *In re Estate of Davis*, 225 Ill. App. 3d 998, 1005 (1992). The guardian of a disabled person's estate may revoke a Totten trust only with court authorization. 755 ILCS 5/11a—18(d) (West 1998). Moreover, such funds may only be used "as necessary for the comfort and suitable support and education of the ward *** or for any other purpose which the court deems to be for the best interests of the ward." 755 ILCS 5/11a—18(a) (West 1998).

Included in the list of accounts Salvi sought to revoke were account Nos. 4168 and 4218. According to the petition, the funds in the Totten trusts were intended to cover "anticipated overall cost and expense in sustaining the ward's person and estate" and "the exposure of federal estate, state inheritance and death tax liability in the event of the ward's death."

On or about June 29, 1998, Judge Bernard Drew granted the guardian's petition. The order provided in relevant part:

"IT IS FURTHER ORDERED that the guardian of the estate is authorized to amend or revoke the Totten Trusts set forth in the petition to the extent necessary to provide increased income to the estate and to provide funds necessary for the care, management and investment of the estate, protective of any beneficiary contingent interest as much as is reasonably possible considering the needs and best interests of the ward pursuant to 755 ILCS 5/11a—18(d) while preserving the interests of the beneficiaries by accounting of the guardian."

Following Weiland's death on October 3, 1999, her disabled person's estate was closed. On or about October 22, 1999, the decedent's estate was opened and Salvi was appointed as independent executor. On May 4, 2000, the Baurhyte claimants and the State filed the claims that comprise the present dispute.

## C. Claims

The State brought its claim on behalf of the People of the State of Illinois "as the ultimate beneficiaries at common law of all assets given or held for charitable public-benefit purposes." The State alleged that account Nos. 4168 and 4218 were Totten trusts naming charitable beneficiaries and that the accounts were improperly liquidated in violation of Judge Drew's June 1998 order. According to the State, the liquidations were improper because Weiland's disabled person's estate contained sufficient assets to provide for her needs. Thus, the funds in the Totten trusts were not necessary to provide for the care and management of Weiland's disabled person's estate as required by sections 11a—18(a) and (d) of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a—18(a), (d) (West 1998)).

The Baurhyte claimants filed a two-count complaint. Count I was directed against Salvi, as independent executor of Weiland's estate. The Baurhyte claimants alleged that Weiland created certain bank accounts, including account No. 5723, as Totten trusts, naming them as beneficiaries. The Baurhyte claimants further alleged that the funds in the Totten trusts established for their benefit were not needed or used for Weiland's benefit. Count II was directed against Smith, as the guardian of Weiland's estate. However, Smith was voluntarily dismissed by the Baurhyte claimants prior to trial and is not a party to this appeal.

## D. Trial Testimony

The trial commenced on January 22, 2001. Lynn Wanner, the keeper of records for La Salle Bank, was the first witness. Wanner testified that she handles document production in response to court requests. Wanner compiled copies of documents related to Weiland's accounts, including bank statements and signature cards. It is the back of the signature card that the customer must complete in order to designate an account as a Totten trust. Relevant here, Wanner produced the front and back of a signature card dated January 3, 1991, for account No. 5723, the front of a signature card dated February 17, 1994, for account No. 4168, and the front and back of a signature card dated February 17, 1994, for account No. 4218. Admitted into evidence by stipulation of the parties were the signature cards pertaining to Weiland's accounts.

Wanner also produced documents purporting to be monthly bank statements for accounts 4168 and 4218. The statements are dated from February 17, 1994, through August 31, 1997. The statements for account No. 4168 are addressed to "HELEN L WEILAND, POD ST FRANCES DESALES [*sic*] CATHOLIC CHURCH, POD CALVARY CHAPEL OF LAKE VILLA, POD THE MARYKNOLL FATHERS & BROTHERS NY." The statements for account No. 4218 are addressed to "HELEN L WEILAND, POD NORBERTINE FATHERS, POD OUR LADY OF MIRACULOUS MEDAL & REV CHARLES F SHELBY & JAMES ILLICHMAN." Wanner admitted that these statements were not the actual statements mailed to the customer. Rather, they represented computer printouts of the records of La Salle Bank as they existed at the time they were generated for the litigation. Wanner stated, however, that the information used to produce both the computer printouts and the statements that are mailed to the customer is identical and that the same information is sent to the customer.

Lisa McCarthy testified that in July 1997 she was employed as a personal banker at La Salle Bank. McCarthy's duties included providing information to customers concerning their accounts. McCarthy noted that account information was routinely entered into the bank's computer system and that, in providing customers information about their accounts, she relied on the computer records as well as signature cards and other bank documents. To the best of McCarthy's knowledge, the bank kept copies of such requests and the bank's responses thereto.

On July 8, 1997, at her supervisor's request, McCarthy responded to an inquiry from the public guardian of Lake County regarding the status of Weiland's accounts at the bank. McCarthy's letter listed 11 separate accounts belonging to Weiland. Among the accounts identified were account Nos. 4168, 4218, and 5723, all three of which listed POD beneficiaries. McCarthy testified that she gathered the information included in the letter from the bank's computer records. McCarthy was unable to recall whether she examined the signature cards in drafting the letter. The letter was admitted into evidence over respondents' objection.

McCarthy testified that, if a customer wanted to add a POD beneficiary to his or her account, she would have the customer complete a new signature card. Regarding the entry of account information into the bank's computer system, McCarthy recalled that the bank used to send any account changes to a central processing department to have the changes recorded. However, at some point, these changes were able to be made at the bank branch.

Michael Williams testified that in 1994 he was senior pastor at Calvary Chapel in Lake Villa and was employed as a personal banker at Comerica Bank. Williams first met Weiland on February 17, 1994, when she opened two individual accounts (Nos. 4168 and 4218) at the bank. According to Williams, the accounts were not established as Totten trusts. Shortly after Weiland opened the accounts, Williams made the first of approximately 15 to 20 visits to her home. Williams explained that the purpose of the initial visit was to determine whether Weiland intended account Nos. 4168 and 4218 to have POD beneficiaries. According to Williams, he was concerned because those two accounts were the only accounts Weiland held at the bank that did not have POD beneficiaries.

Weiland did not make a decision on Williams's first visit. However, Williams made additional visits because Weiland "was lonely, and [he] enjoyed her company, and she loved the Lord, and [they] had good conversations." After about five or six visits, Weiland told Williams that she wished to designate POD beneficiaries. Weiland gave Williams a sheet of paper listing the intended beneficiaries of account No. 4168 as St. Francis de Sales Church, Calvary Chapel of Lake Villa, and Maryknoll Fathers and Brothers, and the intended beneficiaries of account No. 4218 as Norbertine Fathers, Our Lady of the Miraculous Medal, Reverend Charles F. Shelby, and James Illichman. Williams testified that he attempted to dissuade Weiland from including the Calvary Chapel as one of the beneficiaries because he did not want Weiland "to feel like [he] was making visits enjoying her company just to have Calvary Chapel on [the list of beneficiaries]." However, Weiland insisted that the Cavalry Church be named a beneficiary. Williams returned to the bank to prepare the necessary forms to authorize the POD beneficiaries for the two accounts. Although Williams could not recall for certain which forms he filled out, he believed the forms were either change-of-address or file-maintenance forms. The following day, Williams brought the forms to Weiland's house, and she signed the documents. Williams did not complete a new signature card for either of the two accounts because he was "unaware of the procedure."

Williams then sent the forms to the file-maintenance division to input the information in the computer system. Williams testified that in the past if a customer signed the wrong forms or the forms were not complete, the file-maintenance division would send them back to be completed properly. The file-maintenance division never informed Williams that Weiland completed the wrong forms or that they were incomplete. In fact, Williams checked the computer system a few days after he submitted the changes and discovered that the information was properly entered into the system.

On cross-examination, Williams admitted that in the past he testified that the only form that Weiland signed was a change-of-address form. Williams also acknowledged that when he attempted to explain the difference between a money market account and a certificate of deposit to Weiland, she became confused. Williams also admitted that he did not reveal the nature of his relationship with Weiland to anyone at the bank. Williams further stated that his salary at Calvary Chapel increased "[a]s the church grew." Finally, Williams testified that in 1995 or 1996 Weiland told Williams that she liked her funds where they were and that Williams "shouldn't do anything with them." Williams believed that Weiland's sentiments grew out of "speculation of when I was accused of taking or asking her for money."

Cindy Scardino testified that she is the assistant manager of a La Salle Bank branch in Lake Zurich and was Williams's boss in 1994. Scardino helped prepare the bank's operations manual for personal bankers. The manual includes instructions for opening different types of bank accounts, including those designated as Totten trusts. According to Scardino, while some bank forms have changed over the years, it has always been true that a signature card is necessary to change the beneficiary on an account. Scardino stated that during the time the bank was known as Affiliated Bank the process for changing the beneficiary on a Totten trust involved executing a new signature card and completing a file-maintenance form reflecting information on both the original and replacement signature cards. After the customer signed both documents, the personal banker would enter the information into the bank's computer system. The personal banker would then contact another banker to compare the information on the file-maintenance form with the information entered into the computer system. Scardino admitted that the integrity of this "double-check" system depended on the personal banker who opened the account asking a second banker to review the changes. Ultimately, the file-maintenance form and the new signature card were forwarded to a centralized facility for storage. According to Scardino, this same general procedure was followed when the bank became Comerica Bank. Scardino also testified that, even if a customer's account statement does not list POD beneficiaries, it does not mean that there are not any POD beneficiaries on the account.

On cross-examination, Scardino acknowledged that there was a time when personal bankers were not permitted to input data directly into the bank's computer system. Instead, documentation was sent to the file-maintenance division for entry into the system. Scardino was unaware of the exact dates when the change allowing personal bankers to input the information came into effect. Scardino believed that

the file-maintenance division would have required the branch to substantiate any request by requiring a document with the customer's signature or having the required forms completed properly. In this regard, Scardino recalled that in 1994 the account owner would have to sign the file-maintenance form. Scardino also noted that Comerica used to print the names of beneficiaries on account statements, whereas La Salle Bank does not.

Margaret Steiner was employed as the manager of a Lake Zurich branch of La Salle Bank from 1995 to 2000. Prior to working at the Lake Zurich branch, she was employed at Comerica Bank. Steiner explained the procedure used in 1994 to change an account from an individual account to an account with a POD beneficiary. Steiner testified that "in most cases" the existing account would be closed and a new account would be opened. When the new account was opened, the old signature card was replaced with a new signature card. Steiner explained that the reason for requiring the customer to open a new account was that the signature cards were not always stored at the bank branch. As a result, the banker would not always possess the signature card in order to change a designation on it. However, Steiner admitted that, "if somebody wanted to add a beneficiary to an account, sometimes people did that [add a beneficiary to an existing account without executing a new signature card] but you weren't supposed to." She also agreed that someone conceivably "could go in the system" and add a name. Steiner stated that a file-maintenance form would be used for changes of address, new phone numbers, or to correct misspelled names. Although Steiner testified that it was not the bank's policy to use the file-maintenance form to add new beneficiaries to an account, she could not say that the form was never used for that purpose.

According to Steiner, when the bank was part of Comerica, it was the procedure for personal bankers to complete forms in their branch and then send them to a centralized facility for input into the system. Steiner also explained that in 1994, after an account was opened, the signature card was forwarded to a central facility to be microfiched. The original was then returned to the branch for storage. The file-maintenance forms, however, were kept for only one year before being discarded. Steiner believed that the most likely explanation for an inconsistency between the bank's computer records and the signature card is that "someone changed them." However, Steiner also admitted that the documentation needed to effectuate such a change could have been destroyed or lost.

Albert Salvi, Sr., testified that he was hired in 1997 as the attorney for Smith in her capacity as the guardian of Weiland's disabled

person's estate. On June 3, 1998, Salvi assisted Smith in preparing an inventory of Weiland's estate. Item number 16 on the inventory was the guardian's checking account at La Salle Bank with a balance of $192,681.64. Salvi testified that the funds in the guardian's checking account included $10,000 from account No. 5723. According to Salvi, the bank informed him that account No. 5723 was in Weiland's "sole name" and would only require a copy of the letters of office in order to withdraw money from the account. Salvi admitted that he did not examine the signature card for account No. 5723 but believed the account was in Weiland's name alone because of what "the representative at the bank indicated to [him]." Ultimately, the entire proceeds of account No. 5723 were deposited into the guardian's checking account.

Based on statements made by representatives at La Salle Bank, Salvi believed that some of Weiland's accounts, including account Nos. 4168 and 4218, were established as Totten trusts. As a result, Salvi filed a petition to revoke those accounts. Salvi testified that he sought to liquidate the accounts in order to have sufficient funds to pay expenses, taxes, and other obligations if Weiland were to die. Salvi did not want to sell Weiland's house to satisfy her needs because, although it appeared that Weiland was permanently disabled, "there was always the possibility that she could be restored." Salvi further explained that the home was important to Weiland and "there is no way we could have sold that home and felt comfortable that she would never need that home again." Salvi testified that he later learned that some of the accounts he believed were Totten trusts were not POD accounts.

On cross-examination, Salvi testified that the reason he petitioned to revoke the Totten trusts was to cover anticipated costs for the care, management, and investment of Weiland's estate. The basis for Salvi's belief that the estate had insufficient assets was a cost/expense analysis he prepared on May 1, 1998, which listed the following estimated expenses:

| | |
|---|---:|
| "1. Lexington Nursing Home ($4,154.00 per month) | $ 51,700.00 |
| 2. Attorneys—Guardian's Estate | 16,050.00 |
| 3. Guardian's Fee | 9,492.00 |
| 4. 1999 Real Estate Taxes | 3,500.00 |
| 5. Federal Estate Taxes | 165,000.00 |
| 6. State Death Tax | 44,197.00 |
| 7. 1999 Income Tax ($50,000 @ 28%) | 14,000.00 |
| 8. 1041 Federal Taxes October 3, 1999 to October 13, 2000 | 12,853.00 |

| | |
|---|---|
| 9. Administrative Expenses—Decedent's Estate | 25,000.00 |
| 10. Funeral Expenses | 7,000.00 |
| 11. Legal Fee—Preparation of Estate Tax Returns | 7,000.00 |
| 12. Executor's Fees | 7,000.00 |
| 13. Guardian's Annual Bond | 4,000.00 |
| TOTAL | $366,792.00." |

Of the 13 expenses listed in the analysis, Salvi admitted that item numbers 5, 6, 9, 10, 11, and 12 (totaling $255,197) would not be expenses that the disabled person's estate would have to pay, while item numbers 1, 2, 3, 4, 7, 8, and 13 (totaling $111,595) were costs chargeable to the disabled person's estate. Salvi admitted that as of June 3, 1998, the guardian's checking account, which contained funds of $192,681.64, would have been sufficient to pay the expenses chargeable to Weiland's disabled person's estate.

### E. The Trial Court's Rulings

The trial court concluded that account Nos. 4168, 4218, and 5723 were Totten trusts. The court further determined that respondents failed to obtain court approval for revocation of account No. 5723 in violation of section 11a—18 of the Probate Act (755 ILCS 5/11a—18 (West 1998)). The court held that account Nos. 4168 and 4218 were improperly revoked because respondents did not demonstrate that there was a financial need for the funds contained in those accounts as required by Judge Drew's order. The court ordered that the funds due the beneficiaries be paid out of the estate.

### I. ANALYSIS

On appeal, respondents raise four arguments. First, they claim that the trial court used the wrong burden of proof in determining whether the disputed accounts were Totten trusts. Second, respondents argue that the trial court erred in admitting the McCarthy letter as a business record. Third, respondents contend that the claimants failed to prove that the disputed accounts were Totten trusts. Finally, respondents assert that, assuming account Nos. 4168 and 4218 were Totten trusts, they were properly liquidated pursuant to Judge Drew's order. We reach different results with respect to the three accounts in dispute. We will first address the status of account No. 5723. We will then turn our attention to account Nos. 4168 and 4218.

### A. Account No. 5723

Respondents claim that the trial court applied the wrong standard of proof in assessing the Baurhyte claim that account No. 5723 constituted a Totten trust. According to respondents, the claimants

were required to prove that the account was a Totten trust by clear and convincing evidence, not by the preponderance-of-the-evidence standard applied by the trial court.

According to the Baurhyte claimants, registration of an account naming POD beneficiaries raises the presumption that the decedent intended to create a Totten trust in favor of the named beneficiaries. Although no signed Totten trust agreement for account No. 5723 was offered into evidence, the Baurhyte claimants assert that "[i]ndependent documentary evidence identifying account 5723 as a totten [*sic*] trust account and naming the claimants as beneficiaries" was sufficient to raise the presumption that Weiland intended to create a POD trust in their favor.

■ Our research has not discovered any cases discussing the precise burden of proof necessary to show that a decedent intended to create a POD account. However, it has been said that where a decedent, during his lifetime, executes an instrument creating a bank account in his or her own name as trustee for another, there is a presumption that the decedent intended to create a payable-on-death trust in favor of the named beneficiary or beneficiaries. *In re Estate of Petralia*, 48 Ill. App. 2d 122, 136 (1964), *aff'd*, 32 Ill. 2d 134 (1965). In this respect, POD accounts are similar to joint-tenancy bank accounts (see *In re Estate of Lewis*, 193 Ill. App. 3d 316, 318 (1990) (noting that the presumption of a gift arises from the creation of a joint-tenancy account)), and we find instructive those cases discussing the standard of proof applicable to joint accounts.

In *Murgic v. Granite City Trust & Savings Bank*, 31 Ill. 2d 587 (1964), our supreme court discussed the burden of proof applicable to joint accounts. In *Murgic*, the court held that the creation of a joint-tenancy account creates a presumption of donative intent which may be overcome only by the presentation of clear and convincing evidence by the opposing party that a gift was not intended. *Murgic*, 31 Ill. 2d at 590-91; see also *In re Estate of Divine*, 263 Ill. App. 3d 799, 810-11 (1994); *In re Estate of Roth*, 96 Ill. App. 2d 292, 298-99 (1968). Instruments creating joint accounts are considered *prima facie* evidence of donative intent. *Altieri v. Estate of Snyder*, 262 Ill. App. 3d 427, 434 (1992). For this reason, in *Murgic*, *Divine*, and *Roth* the presumption of donative intent arose because the claimants presented evidence of an instrument signed by the decedent expressing an intent to create a joint account. *Murgic*, 31 Ill. 2d at 588; *Divine*, 263 Ill. App. 3d at 805-06; *Roth*, 96 Ill. App. 2d at 295. In cases in which the claimant is not aided by such a presumption, however, he must show donative intent by clear and convincing evidence. This finding is consistent with the longstanding principle that claims against an estate should be

scrutinized with care and should not be allowed except on clear proof. *In re Estate of Andernovics*, 197 Ill. 2d 500, 508-09 (2001).

■ Given the fact that both joint accounts and POD accounts are governed by a presumption based on the existence of a written instrument evidencing the holder's intent, we believe that the standard of review applicable to joint bank accounts should apply to POD accounts. In other words, a written instrument executed by the holder expressing his or her intent to create a POD account raises the presumption of the holder's intent, and such presumption may be overcome only by clear and convincing evidence. However, in the absence of a written instrument executed by the holder, the claimant must show the holder's intent to create a Totten trust by clear and convincing evidence. See *In re Estate of La Pierre*, 132 Ill. App. 2d 751, 754-55 (1971) (implying applicability of clear-and-convincing evidence standard in case involving whether account was established as a Totten trust).

■ In this case, it was undisputed that Weiland entered into an agreement with La Salle Bank or its predecessors to open an account. The dispute centered on the nature of the account and Weiland's intent. The presumption of a POD account did not arise, however, because the Baurhyte claimants did not present evidence of a written instrument executed by Weiland expressing her intent to create a POD account in their favor. As a result, they were required to prove their claim by clear and convincing evidence.

In deciding this case, the trial court wrote:

> "The testimony of the bank employees concerning the reliability of the computer system and the routine procedures required to change computer data convinces the courts [*sic*] *by a preponderance of the evidence* that Helen Weiland did sign such a written agreement and although it was not produced at trial the information contained in [the McCarthy letter] accurately and reliably indicates that on June 22, 1998[,] Account No. 5723 was owned by Helen Weiland in the form of a pay-on-death account naming as after death beneficiaries the *** claimants. *The evidence is not sufficiently persuasive to meet a higher standard of proof.*" (Emphasis added.)

The clear-and-convincing-evidence standard requires more proof than the preponderance-of-the-evidence standard. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 306 (2001); *In re Estate of Blom*, 234 Ill. App. 3d 517, 521 (1992) ("Clear and convincing evidence is something less than beyond a reasonable doubt, but something more than a preponderance of the evidence"). As a result, we would ordinarily remand the cause to the trial court for application of the proper evidentiary

standard. *In re Estate of Ragen*, 79 Ill. App. 3d 8, 14 (1979); *Lazarus v. Pascucci*, 74 Ill. App. 3d 633, 641 (1979). However, in this case the trial court found that the evidence was insufficient to meet a standard of proof higher than a preponderance of the evidence. Consequently, with respect to account No. 5723, we reverse the trial court and conclude that a remand is unnecessary.

## B. Account Nos. 4168 and 4218

### 1. Proper Standard of Review

■ Respondents also claim that the trial court improperly applied the preponderance-of-the-evidence standard of proof in assessing the State's claim that account Nos. 4168 and 4218 constituted Totten trusts. The State replies that respondents' argument is moot because the court also found that it proved by clear and convincing evidence that Weiland intended for account Nos. 4168 and 4218 to be Totten trusts.

We previously determined that the proper standard of proof in determining whether a holder intended an account to be a Totten trust is clear and convincing evidence. At trial, the parties disputed the appropriate standard of proof. The trial court ultimately found that the standard of proof for establishing the intent to create a bank account as a POD account is a preponderance of the evidence. Nevertheless, in pronouncing its decision with respect to account Nos. 4168 and 4218, the court concluded that the State "met both the preponderance-of-the-evidence standard and the clear-and-convincing-evidence standard of proof which the [respondents] argue[ ] should govern all elements of claims in probate estate proceedings." Accordingly, the trial court determined that the State had satisfied both burdens of proof. In light of the court's pronouncement, we agree with the State that this issue is moot. See *Marion Hospital Corp. v. Illinois Health Facilities Planning Board*, 201 Ill. 2d 465, 475 (2002) (noting that an issue is rendered moot "when the resolution of a question of law cannot affect the result of a case as to the parties"); *La Salle National Bank, N.A. v. City of Lake Forest*, 297 Ill. App. 3d 36, 43 (1998) ("An issue is moot when its resolution could not have any practical effect on the existing controversy").

### 2. Admissibility of the McCarthy Letter

Respondents next claim that the trial court erred in admitting the McCarthy letter as a business record. Respondents suggest that the letter constituted hearsay and cite three reasons why it does not fall within the business record exception to the hearsay rule. See 145 Ill. 2d R. 236. More specifically, respondents contend that (1) the letter is

not a memorandum or record of an event or transaction, (2) the letter was not made at or within a reasonable time after the transaction, and (3) the letter was not kept in the regular course of business.

■ Supreme Court Rule 236 governs the admissibility of business records at trial. Rule 236(a) provides in relevant part:

> "Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." 145 Ill. 2d R. 236(a).

Thus, Rule 236 requires only that the party tendering the record satisfy the foundation requirement of demonstrating that the record was made in the regular course of business and at or near the time of the transaction. *Progressive Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 305 (1992). A sufficient foundation for admitting records may be established through testimony of the custodian of records or another person familiar with the business and its mode of operation. *In re Estate of Savage*, 259 Ill. App. 3d 328, 333 (1994). A reviewing court will not disturb a trial court's decision regarding the admissibility of business records absent an abuse of discretion. *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 1081 (1987).

■ The disputed letter was prepared on July 8, 1997, by Lisa McCarthy, a personal banker at La Salle Bank. The letter identified 11 La Salle Bank accounts belonging to Weiland. The letter also listed the manner in which the accounts were held and the balance of each account. The letter indicated that account Nos. 4168, 4218, and 5723 each had POD beneficiaries.

Respondents first claim that the McCarthy letter was not admissible as a business record because it did not constitute a memorandum or record of an event or a transaction. Rather, respondents contend that the letter was a "memorandum or a record of another memorandum or record" and constitutes double hearsay. We disagree. The event or occurrence set forth in the letter was not the creation of the 11 listed accounts, as respondents suggest. Instead, it was the status of those accounts as reflected in the bank's computerized records as of the date the letter was prepared. Moreover, even if respondents' characterization of the letter as "double hearsay" is correct, we find

their argument unpersuasive. Respondents do not cite any authority for the proposition that "double hearsay" falls outside the ambit of Rule 236, and we find nothing in Rule 236 that disqualifies what respondents categorize as "double hearsay." See *Amos v. Norfolk & Western Ry. Co.*, 191 Ill. App. 3d 637, 646 (1989). In fact, as the *Amos* court pointed out, Rule 236 expressly provides that lack of personal knowledge by the maker may affect the weight of the evidence but not its admissibility. *Amos*, 191 Ill. App. 3d at 646.

Respondents also claim that the letter was inadmissible under Rule 236 because it was not made at or within a reasonable time after the transaction. Respondents note that the letter was prepared in July 1997, much later than the events memorialized in the letter. Respondents correctly note that business records sought to be admitted pursuant to Rule 236 must be prepared within a reasonable time after the act or occurrence to which they relate. 145 Ill. 2d R. 236; *Amos*, 191 Ill. App. 3d at 646. This requirement was met here. As we note above, the event or occurrence memorialized in the letter is the status of the 11 listed accounts as of the date the letter was prepared. McCarthy testified that she prepared the letter shortly after she gathered the information. Thus, the letter was prepared within a reasonable time after the event or occurrence to which it relates.

Finally, respondents contend that the letter was inadmissible under Rule 236 because the letter does not constitute a record kept in the regular course of business. According to respondents, the letter was merely a response to the public guardian's request for information on the status of Weiland's accounts. We disagree.

McCarthy testified that, as a personal banker at La Salle Bank, she routinely provided customers with information regarding their accounts. In gathering such information, McCarthy normally relied on computer records and bank documents, including signature cards. McCarthy testified that, to the best of her knowledge, the bank kept a copy of such requests and the bank's responses thereto on file. According to McCarthy, the July 8, 1997, letter was prepared at her supervisor's direction and was in response to a request from Weiland's then guardian for information about Weiland's accounts. Although McCarthy could not recall whether she consulted the signature cards for each account in preparing the letter, she stated that the information contained in the letter was based on the bank's computer records. McCarthy followed her supervisor's instruction and drafted the letter. Under such circumstances, we find that the letter was prepared in the regular course of business. We note that the fact that a record is made in response to a singular occurrence or event does not require a conclusion that it was not made in the regular course of business. *Tie*

*Systems, Inc. v. Telcom Midwest, Inc.*, 203 Ill. App. 3d 142, 150 (1990); *Birch v. Township of Drummer*, 139 Ill. App. 3d 397, 407 (1985).

In sum, the McCarthy letter constituted a record of the status of Weiland's accounts as reflected in the bank's computerized records as of the date the letter was prepared. Moreover, it was prepared in the regular course of business at or near the time of the transaction. Accordingly, the trial court did not abuse its discretion in admitting the letter.

### C. Nature of Account Nos. 4168 and 4218

Respondents next claim that, in the absence of a signed agreement evidencing the creation of a Totten trust, specifically a signature card, the testimony and documentary evidence elicited by the State was insufficient to establish that Weiland intended account Nos. 4168 and 4218 to have POD beneficiaries. The State does not dispute that it failed to discover or produce any documents signed by Weiland converting account Nos. 4168 and 4218 from individual accounts to Totten trusts. However, the State claims that it established the existence of two contracts evincing Weiland's intent to convert account Nos. 4168 and 4218 from individual accounts to Totten trusts.

■ We initially address whether the absence of a signature card signed by Weiland establishing a Totten trust, by itself, is sufficient to defeat the State's claim that Weiland intended to convert the disputed accounts to POD accounts. Resolution of this issue requires us to interpret section 4 of the Illinois Trust and Payable on Death Accounts Act (Act) (205 ILCS 625/4 (West 1998) (now, as amended, 205 ILCS 625/4 (West Supp. 2001))). The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *In re Ben S.*, 331 Ill. App. 3d 471, 472 (2002). The language used by the legislature is the best indicator of the legislature's intent. *Boylan v. Matejka*, 331 Ill. App. 3d 96, 98 (2002). Where the language of a statute is unambiguous, it is given effect without resort to other aids of statutory construction. *Rolando v. Pence*, 331 Ill. App. 3d 40, 44 (2002). Statutory construction is a question of law subject to *de novo* review. *Thompson v. Village of Newark*, 329 Ill. App. 3d 536, 539 (2002).

■ Section 4 of the Act provides in relevant part:

> "*If a person opening or holding an account signs an agreement with the institution providing that on the death of the person designated as holder the account shall be paid to or held by another person or persons, the account, and any balance therein which exists from time to time, shall be held as a payment on death account* and unless otherwise agreed in writing between the person opening or holding the account and the institution:

(a) The holder during his or her lifetime may change any of the designated persons to own the account at his or her death without the knowledge or consent of said designated persons by a written instrument accepted by the institution;

(b) The holder may make additional deposits to and withdraw any part or all of the account at any time without the knowledge or consent of the designated person or persons to own the account at his or her death, subject to the bylaws and regulations of the institution, and all withdrawals shall constitute a revocation of the agreement as to the amount withdrawn; and

(c) Upon the death of the holder of the account, the person so designated to be the owner of the account who is then living shall be the sole owner of the account, unless more than one person is so designated and then living in which case said persons shall hold the account in equal shares as tenants in common. If no such person designated as the owner of the account on the death of the holder is then living, the proceeds shall vest in the estate of the holder of the account." (Emphasis added.) 205 ILCS 625/4 (West 1998).

Thus, the plain language of section 4 specifies that in order to establish the existence of a POD account, a claimant must show that the holder of the account executed a written agreement demonstrating his or her intent to have the proceeds of the account paid to a designated beneficiary or beneficiaries at the time of the holder's death. While section 4 of the Act requires a signed agreement evincing the intent of the holder to create a POD account, nothing in the Act specifies the form that the agreement must take. Indeed, it is well established that it is the intent of the account holder, not the form of the written agreement, that governs whether the holder intended to establish a POD account. See *La Pierre*, 132 Ill. App. 2d 751 (ultimately rejecting establishment of POD account; although certificate of deposit expresses holder's intent to create POD account, holder failed to identify beneficiary of the account); *In re Estate of Waitkevich*, 25 Ill. App. 3d 513 (1975) (suggesting that, even in absence of signature card expressing holder's intent to create a POD account, testimony from bank employee that holder knew of nature of account would have been sufficient to establish Totten trust).

Accordingly, neither a signature card nor any other particular form of writing is required by the statute. Instead, the record must establish the existence of a writing expressing the intent of the holder to establish a POD account. Consequently, we must determine whether, in this case, the State proved the existence of a written agreement demonstrating Weiland's intent. As noted above, the trial court concluded that the State met its burden in this respect. We will not

disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *In re Estate of Pohn*, 67 Ill. App. 2d 227, 234 (1966). In order for a finding to be against the manifest weight of the evidence, it must appear that a conclusion opposite to that reached by the trial court is clearly evident. *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 986 (1984).

The State admits that it did not present a written document that expressly demonstrated Weiland's intent to convert account Nos. 4168 and 4218 to POD accounts. Instead, the State attempted to prove the existence of a written agreement demonstrating Weiland's intent to establish a POD account through the testimony of current and former bank personnel as well as the presentation of those documents related to Weiland's accounts that the bank had archived. On appeal, the State invokes the best-evidence rule to support its contention that Weiland executed a written agreement demonstrating her intent to establish account Nos. 4168 and 4218 as POD accounts.

■ Under the best-evidence rule, the existence of a contract or other writing may be proven by testimony or other indirect evidence when it is shown that the original writing was lost, destroyed, or otherwise unavailable. *People v. Barber*, 116 Ill. App. 3d 767, 778 (1983); *Electric Supply Corp. v. Osher*, 105 Ill. App. 3d 46, 48 (1982); see also *People v. Baptist*, 76 Ill. 2d 19, 26-27 (1979). In such a case, the proponent must prove the prior existence of the original, its unavailability, and the proponent's own diligence in attempting to procure the original. *Baptist*, 76 Ill. 2d at 26; *Electric Supply Corp.*, 105 Ill. App. 3d at 48-49. The sufficiency of the evidence showing that it is not within the offering party's power to produce the original depends upon the circumstances of each case and is within the discretion of the trial court. *Electric Supply Corp.*, 105 Ill. App. 3d at 49. We find no abuse of discretion here.

■ Williams testified that Weiland signed two documents converting account Nos. 4168 and 4218 to Totten trusts. Williams could not remember the titles of the forms he completed to effectuate the change. However, he did indicate that the forms were either change-of-address forms or file-maintenance forms. Williams admitted that he did not complete a new signature card for either account. Bank personnel testified that in 1994 the bank did not have a change-of-address form. Instead, a file-maintenance form was used to request a change of address. The testimony also revealed that file-maintenance forms were kept for only one year before being discarded. The bank's keeper of records stated that she provided copies of all signature cards, bank statements, and other bank records on file related to Weiland's accounts. Accordingly, the evidence suggests the existence of a writing,

its unavailability, and a diligent search to procure the original document.

We also find that the evidence supports the trial court's finding that account Nos. 4168 and 4218 were Totten trusts. Respondents point out what they categorize as credibility issues with Williams's testimony. For instance, they claim that Williams's testimony was discredited by evidence that suggested that he had a pecuniary interest in having the Calvary Chapel named as a beneficiary on Weiland's account because, as the senior pastor at the institution, his salary would increase as the church "did well." Respondents also note that Williams failed to inform the bank of his relationship with Weiland and they question Williams's testimony regarding when he first approached Weiland and when the addition of the beneficiaries was made. Furthermore, respondents question the reliability of the contents of the McCarthy letter.

However, it is the province of the trial court to judge the credibility of the witnesses, to determine the weight to be accorded their testimony, and to draw inferences from their testimony. *Prairie Eye Center, Ltd. v. Butler*, 329 Ill. App. 3d 293, 299 (2002). The trial court found Williams's testimony credible. As a reviewing court, we will overturn a trial court's factual findings on appeal only if they are against the manifest weight of the evidence. *Prairie Eye Center*, 329 Ill. App. 3d at 299. In the present case, the trial court was aware of these alleged shortcomings in Williams's testimony. Nevertheless, the court found credible Williams's explanation of how Weiland added POD beneficiaries to account Nos. 4168 and 4218. Williams testified that, after Weiland opened the two accounts, he realized that all of her other accounts at La Salle Bank were held as POD accounts. Williams visited Weiland's home to discuss the discrepancy between account Nos. 4168 and 4218 and the remainder of Weiland's accounts. During a later visit, Weiland informed Williams that she wanted to add POD beneficiaries to account Nos. 4168 and 4218. Weiland handed Williams a piece of paper indicating the names of the intended beneficiaries. In response, Williams prepared two forms for this purpose, obtained Weiland's signature on both documents, and forwarded them to the bank's central-processing facility for input into the bank's computer. The McCarthy letter corroborates Williams's story and indicates that the changes were actually made. Based on this evidence, we cannot say that the trial court's findings were against the manifest weight of the evidence.

Indeed, Williams's testimony was not contradicted by the testimony of any other witness at trial. Nevertheless, respondents suggest that Williams could have altered the bank's computer records

himself to convert the two accounts without having obtained a signed document from Weiland. However, Williams testified that in 1994 personal bankers were without the ability to input data into the bank's computer system. Instead, bank employees would forward customer information to a central-processing facility for entry. Williams's testimony was corroborated by McCarthy, Scardino, and Steiner, who stated that there was a time when they were not permitted to input data into the bank's computer system. The trial court found Williams's testimony on this issue credible. Based on the evidence presented at trial, we cannot say that the trial court's finding was against the manifest weight of the evidence.

In fact, Williams's testimony was corroborated in another important respect. Williams testified that, if there was a problem with any forms, the file-maintenance division would return them to be properly completed. Scardino testified that in 1994, the bank required the customer to sign the file-maintenance form. Scardino's testimony suggests that the file-maintenance division likely considered Weiland's signature on the file-maintenance form to be sufficient to substantiate her request to add POD beneficiaries to her accounts.

Moreover, Williams's testimony was supported by the McCarthy letter and the monthly bank statements admitted into evidence. The McCarthy letter reflected that the disputed accounts contained POD beneficiaries. The bank statements indicated that Weiland had completed the documents required to add POD beneficiaries to her account as early as March 8, 1994, the closing date of the first monthly statement for one of the accounts. While Wanner admitted that the statements were not the exact statements sent to Weiland, she stated that they represented computer printouts of the records of La Salle Bank as they existed at the time they were generated for the litigation. Wanner also noted that the information used to produce both the computer printouts and the statements that are mailed to the customer is the same, and that the same information is sent to the customer.

Respondents also complain that the trial court ignored significant parts of Steiner's testimony regarding the "most likely" reason that the bank's computer records may conflict with a signed signature card. Steiner believed that the most likely explanation for an inconsistency between the bank's computer records and the signature card is that "someone changed them." However, there was other evidence to explain the discrepancy. Steiner herself admitted that the documentation needed to effectuate such a change could have been destroyed or lost. Further, Williams's testimony also provided an explanation for the discrepancy. The trial court found Williams believ-

able. We will reverse the judgment of the trial court only when its decision is contrary to the manifest weight of the evidence, not when the evidence is merely conflicting. *Wencordic Enterprises, Inc. v. Berenson,* 158 Ill. App. 3d 913, 918 (1987).

In short, the trial court's finding that Weiland intended to add POD beneficiaries to account Nos. 4168 and 4218 is supported by Williams's uncontradicted testimony that Weiland signed documents expressing her intent to establish Totten trusts, testimony that the addition of the beneficiaries would not have been completed without the proper documentation, and bank records demonstrating that POD beneficiaries had been added to the accounts. Accordingly, we affirm the trial court's finding that account Nos. 4168 and 4218 constituted Totten trusts.

## D. Liquidation

Finally, respondents argue that, even if the trial court properly determined that account Nos. 4168 and 4218 constituted Totten trusts, the court erred in concluding that the accounts were improperly liquidated. According to respondents, Judge Drew's June 1998 order authorized the guardian to liquidate the trusts in order to meet the estimated expenses of the disabled persons's estate *and* the decedent's estate.

■ Ordinarily, the owner of a POD account may revoke the account at any time during his or her lifetime. 205 ILCS 625/4 (West 1998); *Cotton v. First State Bank of Mendota,* 182 Ill. App. 3d 400, 402-03 (1989). However, the power to revoke a POD account does not automatically transfer to the account holder's guardian upon the holder's disability. Once a guardian is appointed for the holder, a court order is required to revoke a POD account. 755 ILCS 5/11a—18(d) (West 1998). In this regard, section 11a—18(d) of the Probate Act (755 ILCS 5/11a—18 (West 1998)) provides in relevant part:

> "Adjudication of disability shall not revoke or otherwise terminate a trust which is revocable by the ward. A guardian of the estate shall have no authority to revoke a trust that is revocable by the ward, except that the court may authorize a guardian to revoke a Totten trust or similar deposit or withdrawable capital account in trust to the extent necessary to provide funds for the purposes specified in paragraph (a) of this Section." 755 ILCS 5/11a—18(d) (West 1998).

Section 11a—18(a) of the Probate Act (755 ILCS 5/11a—18(a) (West 1998)) provides:

> "To the extent specified in the order establishing the guardianship, the guardian of the estate shall have the care, management and investment of the estate, shall manage the estate frugally and

shall apply the income and principal of the estate so far as necessary for the comfort and suitable support and education of the ward, his minor and adult dependent children, and persons related by blood or marriage who are dependent upon or entitled to support from him, or for any other purpose which the court deems to be for the best interests of the ward, and the court may approve the making on behalf of the ward of such agreements as the court determines to be for the ward's best interests." 755 ILCS 5/11a—18(a) (West 1998).

In this case, Weiland's guardian petitioned the court for an order authorizing revocation of the 11 POD accounts held in Weiland's name at La Salle Bank. In response to the guardian's petition, the trial court issued the following order:

"IT IS FURTHER ORDERED that the guardian of the estate is authorized to amend or revoke the Totten Trusts set forth in the petition to the extent necessary to provide increased income to the estate and to provide funds necessary for the care, management and investment of the estate, protective of any beneficiary contingent interest as much as is reasonably possible considering the needs and best interests of the ward pursuant to 765 ILCS 5/11a—18(d) while preserving the interests of the beneficiaries by accounting of the guardian."

The evidence in this case established that the guardian liquidated POD accounts to meet the estimated expenses of Weiland's decedent estate at a time when she was still alive and under a disability. However, nothing in the order authorized the guardian to use the ward's funds for expenses associated with the ward's decedent's estate.

In fact, Salvi admitted that the money available in Weiland's checking account at the time the petition was filed would have been more than sufficient to meet the estimated expenses of Weiland's disabled person's estate. At the time the petition was filed, Salvi anticipated expenses of $366,792 in the forthcoming year. However, Salvi admitted that his estimate included $255,197 in costs not properly chargeable to the disabled person's estate, but instead to the decedent's estate. Salvi further acknowledged that the $192,682 in Weiland's checking account would have been sufficient to cover the expenses chargeable to Weiland's disabled person's estate. Consequently, the funds liquidated from the POD accounts at La Salle Bank were not necessary for the care, management, and investment of Weiland's disabled person's estate. Thus, the liquidation of the two disputed accounts violated Judge Drew's order.

While the Act does allow the guardian to petition the court for estate planning purposes (755 ILCS 5/11a—18(a—5) (West 1998)), Salvi did not petition the court under this provision. In any event, the

testimony suggests that Salvi intended the funds in these accounts to cover the liability for the estimated taxes rather than using the funds as an estate planning tool to minimize such taxes.

Consequently, we conclude that the liquidation of account Nos. 4168 and 4218 was improper. Having determined that the revocation of the POD accounts was improper, we find that the trial court also correctly ruled that the proceeds of the accounts should be paid to the charitable beneficiaries out of Weiland's estate.

## III. CONCLUSION

For the aforementioned reasons, the judgment of the circuit court of Lake County with respect to account No. 5723 is reversed. However, the court's judgment with respect to account Nos. 4168 and 4218 is affirmed.

Affirmed in part and reversed in part.

BOWMAN and KAPALA, JJ., concur.