FIRST DIVISION
December 15, 2008

No. 1-07-0435

| | | |
|---|---|---|
| ROBERT E. KEHOE, JR. | ) | Appeal from the |
|     Plaintiff-Appellee and | ) | Circuit Court of |
|     Cross-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| WILDMAN, HARROLD, ALLEN AND, | ) | |
| DIXON, JOHN L. EISEL, MICHAEL | ) | Nos. 97 CH 12226 and |
| L. McCLUGGAGE, ROBERT L. | ) |      02 L 13398 (cons.) |
| SHUFTAN, MICHAEL DOCKTERMAN, | ) | |
| AND DAVID J. FISCHER, | ) | |
|     Defendants-Appellants and | ) | |
|     Cross-Appellees, | ) | |
| | ) | |
| and | ) | The Honorable |
| | ) | Allen S. Goldberg, |
| RICHARD BARTELT, | ) | Judge Presiding. |
|     Defendant. | ) | |

JUSTICE GARCIA delivered the opinion of the court.

This appeal arises from Robert E. Kehoe, Jr.'s suit against his former law firm, Wildman, Harrold, Allen & Dixon (the Firm), and six of his former law partners, Richard C. Bartelt, Michael R. Dockterman, John L. Eisel, David J. Fischer, Michael L. McCluggage and Robert L. Shuftan, for alleged breach of the partnership agreement and alleged breach of their fiduciary duty to the plaintiff arising from a vote to change the plaintiff's status from equity to nonequity partner.

The jury returned its verdict for the plaintiff. The jury found the Firm and four of the six partner defendants breached the partnership agreement and the four partner defendants breached their fiduciary duty to the plaintiff. The jury found in favor of Bartelt on both claims. The jury found in favor of Eisel on the breach of contract claim, but made contradictory findings as to the breach of fiduciary duty claim. The jury answered the "Jury Question on Plaintiff's Claim for Breach of Fiduciary Duty" that the plaintiff did not prove the elements of his claim for breach of fiduciary duty against Eisel. But the jury returned a verdict against Eisel on the fiduciary duty verdict form. The trial court, treating the "Jury Question" as a special interrogatory, entered judgment in favor of Eisel. The trial court entered judgment on the jury's verdict against the Firm and the same four partner defendants the jury found liable on the two claims.

Posttrial motions were filed by both sides. The trial court denied the posttrial motions filed by the Firm and the four partner defendants. On the plaintiff's posttrial motion, the trial court reversed itself on the fiduciary duty claim as to Eisel:

> "[The] jury question did not act as a special interrogatory, and
> therefore judgment should not have been entered based on the
> jury's negative answer to the question of whether Plaintiff proved
> the elements of his claim of breach of fiduciary duty against
> Defendant John L. Eisel but should have, instead, been entered
> based on the jury verdict, which found in favor of Plaintiff."

The trial court, however, denied the plaintiff's motion that he receive prejudgment interest.

The Firm and the partner defendants contend the trial court erred in denying their motion

2

for judgment notwithstanding the verdict as to the breach of contract claim because changing the plaintiff's status from an equity to nonequity partner was not the equivalent of an involuntary withdrawal under the partnership agreement. The four partner defendants contend the manifest weight of the evidence does not support a finding that a breach occurred on the contract action. The partner defendants, including defendant Eisel, contend the manifest weight of the evidence does not support a finding that a breach occurred on the fiduciary duty count. Regarding the breach of fiduciary duty count, the partner defendants contend the plaintiff failed to establish that the votes taken by the partner defendants proximately caused injury to the plaintiff. Defendant John Eisel contends the trial court erred in reconsidering its initial judgment entered in his favor. The partner defendants contend the trial court committed reversible errors on the fiduciary duty count in refusing their proposed jury instructions and allowing irrelevant and prejudicial evidence concerning the separation of partners in 1994. Finally, the Firm and partner defendants contend the trial court erred in awarding the plaintiff costs for trial transcripts.

On cross-appeal, the plaintiff contends he is entitled to interest under the Interest Act (815 ILCS 205/2 (West 2006)) because the damages he was awarded are liquidated damages. The plaintiff argues the trial court erred in finding he was procedurally barred from receiving interest under the Act because he did not file his motion before judgment was entered.

For the reasons that follow, on the defendants' appeal, we affirm the judgment of the circuit court only as to the judgment entered against the Firm. On the plaintiff's cross-appeal, we reverse the court's order denying the plaintiff's motion for prejudgment interest.

3

BACKGROUND

The defendant Wildman, Harrold, Allen & Dixon is a Chicago law firm. The plaintiff became an equity partner of the Firm in 1979.

At trial, the plaintiff introduced evidence that in 1994, the Firm's management committee conducted a review of the productivity of the Firm's partners. Following the review, 10 partners were identified and offered separation packages. The partners resigned and received payments pursuant to negotiated separation agreements. Most of the agreements provided the partners with the article VII benefits normally paid to an involuntarily withdrawn partner according to the 1991 partnership agreement. During the 1994 review, the plaintiff's productivity was discussed, but he remained an equity partner.

In 1995, the Firm met with several banks to negotiate restructuring its financing. In November 1995, the partnership approved a loan agreement with American National Bank (ANB). Partner defendant Fischer negotiated the loan agreement. The original ANB loan agreement required each equity partner to execute a personal guaranty "in a form acceptable to the bank." By February 1996, every partner, except the plaintiff, had executed an acceptable personal guaranty. The plaintiff expressed objections to some of the provisions of the guaranty. The plaintiff testified he informed Eisel that he would sign a guaranty if his concerns were met. The plaintiff further testified he offered to draft papers that would eliminate his objections, but Fischer refused him access to the file. The loan closed without a personal guaranty from the plaintiff.

Later, the Firm negotiated with ANB to eliminate or modify some, but not all, of the

provisions the plaintiff objected to. An amendment to the loan agreement was made in July 1996 (the amendment). The amendment further defined the individual partners' obligations should ANB seek to enforce the guaranty. The plaintiff testified the amendment eliminated the requirement that every partner provide a guaranty, but specifically noted that any partner not providing a guaranty would be exposed to personal liability for the full amount of the debt.

ANB never approached the plaintiff about his failure to execute a guaranty. At trial, Eisel admitted ANB allowed the Firm to use the line of credit even though the plaintiff had not signed a personal guaranty.

In November 1996, Eisel informed the plaintiff ANB wanted personal guaranties. However, the plaintiff believed the amendment removed that requirement. The plaintiff testified no one approached him regarding his failure to sign a personal guaranty between July 1996, when the amendment was executed, and November 1996.

On November 25, 1996, the management committee held a meeting and proposed a resolution to the partnership that allowed the partnership to change any equity partner's status to a non-equity partner should he or she fail to execute a personal guaranty for the ANB loan. Eisel was the Management committee chairman and four of the other partner defendants were committee members, Fischer being the only individual partner defendant in this suit not to be a member of the committee. The proposed resolution was to take effect January 1, 1997. Prior to the resolution being adopted, the partnership agreement allowed for a change of an equity partner's status to nonequity partner by an affirmative vote of at least 67% of the partnership interests.

Eisel presented the resolution at the partnership meeting. The presentation was recorded in a voice-mail message Eisel left for all the partners unable to attend the meeting. The plaintiff was present at the meeting and given an opportunity to ask questions and address the partners who were present. The plaintiff explained his objections to the resolution. After the meeting, the plaintiff was given the opportunity to present his objections to the partners not present at the meeting; he chose not to. The resolution was put to a vote and approved by 55 of the 61 equity partners, representing 88% of the outstanding partnership interests.

After the resolution passed, certain partner defendants encouraged the plaintiff to sign the ANB guaranty to protect his status as an equity partner, but he refused. As of January 1, 1997, the Firm considered the plaintiff a nonequity partner. On January 2, 1997, the plaintiff requested his equity be paid out under article VII, paragraph Q, of the partnership agreement. The Firm claims it received requests on January 3, 1997, from clients to transfer their files to the plaintiff, who had established his own law firm. The committee chair sent the plaintiff a memo dated January 3, 1997, advising him the Firm considered him a nonequity partner.

The management committee refused to pay the plaintiff his share of the equity in the Firm. The plaintiff sued alleging the defendants breached their obligation to distribute his equity and the individual partner defendants breached their fiduciary duties when they recommended voting in favor of the resolution.

At the time the plaintiff left the Firm, it was governed by a partnership agreement dated July 21, 1995 (partnership agreement). The pertinent portions of the partnership agreement state:

"I. Definitions.

C. Withdrawal of a Partner.

(1) The term 'involuntary withdrawal' wherever used herein shall mean the withdrawal of a partner from the firm as a result of (i) action taken by the other partners, which action shall be by not less than sixty-seven percent of the share interest held by the partners; (ii) compelling reasons of health, which shall be defined as any condition preventing said individual from practicing law or engaging in any other gainful employment anywhere, or (iii) death.

\* \* \*

G. Other definitions.

\* \* \*

'Partner' or 'Partners' means a member or members of the firm. The term shall refer to equity partners only, except when the context clearly indicates that non-equity partners are being referenced.

\* \* \*

II. Partnership Interests.

\* \* \*

I. Equity Partner.

(4) Upon recommendation by the Management Committee and approval by 67% of all Schedule A shares, an equity partner

may become a non-equity partner as of January 1st of the following year. The provisions of paragraph H [Non-Equity Partner] above shall apply to any such equity partner who becomes a non-equity partner except as follows:

(a) Any separation benefits will be vested (provided a person is a partner, equity or non-equity, for the requisite number of years) and will be frozen at their existing level. *** The obligation to make such payments shall be non-recourse to the individual equity partners of the firm;

* * *

VII. Separation Payments to Partners Who Involuntar[il]y Withdraw ***.

Q. Involuntary Withdrawal. If an equity partner's separation results from his or her involuntary withdrawal, the firm shall pay to the withdrawn partner (or his or her successor in interest, as appropriate) a sum equal to twice his or her Base Amount. Payment shall be made in one hundred twenty (120) equal monthly installments, commencing on the last day of the month following the month in which separation occurred.

* * *

IX. Limitations on Payments.

T. The total payments provided by this agreement to

be made by the Chicago firm to any withdrawn partner ***

shall be made only from the net income of the firm."

The plaintiff introduced into evidence a redlined version of the agreement to show the changes between the 1991 and 1995 agreements. The parties offered testimony regarding the intent of the agreement and in particular, what was meant by the term "involuntary withdrawal."

The parties stipulated that if the involuntary withdrawal provision applied, the plaintiff was entitled to receive $405,116. The trial court found the partnership agreement "ambiguous" and charged the jury with determining whether the defendants' removal of the plaintiff as an equity partner constituted an "involuntary withdrawal" under the agreement. If the plaintiff's removal was found to be an involuntary withdrawal, then he was entitled to receive a distribution of his equity under the separation payments provision of the partnership agreement. Based on the parties' stipulation, the only dispute was whether a payout was required.

The jury was charged with deciding two causes of action, breach of contract and breach of fiduciary duty. The court provided the jury with the partnership agreement and instructed the jurors that the terms of the agreement were the terms of the parties' contract. The court instructed the jury that the plaintiff alleged the defendants breached that contract by refusing to pay him under paragraph Q of article VII. Regarding the fiduciary duty claim, the court instructed the jury that the plaintiff alleged the defendants' use of the resolution to avoid paying him separation benefits breached that duty.

On January 18, 2006, the jury returned a verdict in favor of the plaintiff on both counts. The court entered judgment on the jury verdict against the Firm, and certain partner defendants for the stipulated amount of $405,116. The court denied the defendants' posttrial motion but granted the plaintiff's request to enter judgment against defendant John Eisel for breach of fiduciary duty. However, the trial court denied the plaintiff's motion for prejudgment interest. The defendants, the Firm and the five partner defendants, timely appealed. The plaintiff cross-appealed.

## ANALYSIS

The Firm and the partner defendants raise six issues on appeal. Their primary argument is that they were entitled to judgment notwithstanding the verdict on both counts. According to the partner defendants, if the Firm did not wrongly deny the plaintiff separation benefits under the partnership agreement, then, as a matter of law, the plaintiff cannot establish a breach of fiduciary duty. In the alternative, the partner defendants (but not the Firm) contend they are entitled to a new trial based on four separate grounds: (1) the manifest weight of the evidence favored the defendants; (2) irrelevant testimony was introduced; (3) the jury was improperly instructed; and (4) the trial court improperly reconsidered the judgment it entered in Eisel's favor. All defendants contend the trial court erred in awarding court reporter expenses to the plaintiff.

The plaintiff cross appeals the denial of prejudgment interest.

### I. Breach of Contract

#### A. Judgment Notwithstanding the Verdict

The plaintiff's theory is that the defendants failed to pay the separation benefits he was

10

entitled to under the partnership agreement when he withdrew from the Firm in January 2007. The failure of the Firm to pay the separation benefits constituted a breach of contract. The failure to pay also formed the basis for his breach of fiduciary duty claim because over 67% of the partners voted to pass the resolution that precipitated the plaintiff's withdrawal from the Firm and the voting partners were provided misinformation by the partner defendants.

The Firm and the partner defendants argue they were entitled to judgment notwithstanding the verdict based on the express terms of the partnership agreement and the resolution adopted by the partners, which resulted only in the change of status of the plaintiff from equity to nonequity partner. In essence, the defendants contend because the plaintiff was allowed to continue to practice with the Firm as a nonequity partner, the plaintiff was not entitled to any separation benefits. When the plaintiff chose to leave the Firm, he did so voluntarily, and the separation benefits provision of the partnership agreement was never triggered.

"'Judgment notwithstanding the verdict should not be entered unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.'" McClure v. Owens Corning Fiberglass Corp., 188 Ill. 2d 102, 132, 720 N.E.2d 242 (1999), quoting Holton v. Memorial Hospital, 176 Ill. 2d 95, 109, 679 N.E.2d 1202 (1997). We apply a de novo standard of review to the trial court's denial of the defendants' motion for judgment n.o.v. See McClure, 188 Ill. 2d at 132.

## B. The Firm's Liability

In their main brief, the defendants argue the change in the plaintiff's status to a nonequity

11

partner was not an "involuntary withdrawal" triggering separation payments under the partnership agreement because "it did not require the plaintiff to withdraw. [The resolution] changed his status to non-equity partner because he failed to provide a personal guaranty as all of the other equity partners did. The evidence was undisputed that Plaintiff was welcome to, and indeed expected to, practice law at the firm after January 1, 1997."

The circuit court found the partnership agreement ambiguous as to the event that would trigger the separation benefits. Conflicting testimony was presented by the plaintiff and the Firm on this point. Accordingly, if the partnership agreement was properly ruled ambiguous, then whether the separation benefits provision was triggered under the facts adduced in this case was for the jury to decide. See Farm Credit Bank of St. Louis v. Whitlock, 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991) (once a document is ruled ambiguous and conflicting extrinsic evidence is presented on the intent of the parties, the construction of the contract becomes a question of fact for the jury to decide).

In their reply brief, the defendants contend "the trial court erred in finding the partnership agreement ambiguous and in allowing the jury to interpret its terms, thus abrogating the court's role to interpret contracts as a matter of law." The plaintiff correctly points out that the Firm did not argue in its main brief "that the trial court's finding of ambiguity was error." The Firm, while not conceding this point, responds that it challenged the ambiguity ruling by the circuit court by its contention that it is entitled to judgment n.o.v., which raises a question of law.

Because we find the circuit court's "ambiguity" ruling to be dispositive of this issue, we elect to address that ruling directly. Put simply, we must determine whether the partnership

12

agreement "is capable of being understood in more sense than one." Farm Credit Bank of St. Louis, 144 Ill. 2d at 447.

Notably, the Firm focuses on the "separation payments" provision of the agreement, contending no term within that provision is ambiguous. The plaintiff focuses on the "involuntary withdrawal" provision, contending that the forced drop in his status from equity to nonequity can be interpreted to be an involuntary withdrawal. To the extent these positions are not irreconcilable, we agree with both parties. The separation provision is clear and unambiguous: separation payments are due only when "an equity partner's separation results from his or her involuntary withdrawal." However, the question remains, what constitutes an "involuntary withdrawal." For that answer, the jury had to look to the definition of the term "involuntary withdrawal" in the partnership agreement and, there, as the plaintiff argues, we find ambiguity.

According to the salient portion of article I, paragraph C, an involuntary withdrawal means "the withdrawal of a partner from the firm as a result of *** action taken by the other partners." While the Firm insists that an involuntary withdrawal cannot occur without the affected partner being "required to withdraw," we find no such requirement in the definition of the term. Under a literal reading of the definition of the term, a "withdrawal of a partner" need not be compelled or required by the action of the other partners. Absent clear and unambiguous language that a withdrawal by a partner, done wilfully yet precipitated by action taken by the requisite percentage of his fellow partners, was not an "involuntary withdrawal," it was for the jury to decide whether the withdrawal of the plaintiff from the Firm was involuntary. Under the facts presented by the parties, it was for the jury to decide whether the passage of the resolution

13

making the plaintiff a nonequity partner on January 1, 2007, which in turn caused the plaintiff to withdraw from the partnership immediately thereafter, triggered the separation benefits provision. The jury decided "yes," and we are unpersuaded that only a contrary verdict based on the record evidence in this case could stand. See McClure, 188 Ill. 2d at 132.

The controlling provision appears to provide that whenever the withdrawal of a partner from the Firm occurs, regardless of his personal motivation (such as to start his own practice), as a result of action taken by at least 67% of the other partners, the withdrawal may be an "involuntary withdrawal." Here, the plaintiff withdrew as partner from the Firm as a result of the vote taken on November 25, 1996 on the resolution, dropping his status from equity to nonequity partner effective January 1, 1997. The Firm contends that because the plaintiff could have remained with the Firm as a nonequity partner, his departure was voluntary, not an involuntary withdrawal. Yet, the evidence suggests that had the plaintiff been given his druthers, he would have remained with the Firm as an equity partner, a status, however, that was foreclosed to him based on the affirmative vote on the resolution. The plaintiff, in fact, argued against the passage of the resolution to the partners present for the vote on November 25, 1996. The vote went against the plaintiff, and as a result of the vote by more than the requisite percentage of partners adopting the resolution, the plaintiff withdrew as a partner.

We are unpersuaded by the Firm's contention that because only the plaintiff's status in the partnership was subject to change as a result of the action taken by the other partners in adopting the resolution, his withdrawal from the Firm within two days of the effective date of the resolution was voluntary. The definition of "voluntary withdrawal" in the agreement provides

14

little, if any, support for the Firm's contention. According to the partnership agreement, a voluntary withdrawal means any "withdrawal of a partner from the firm for any reason that does not constitute an involuntary withdrawal."

Once the trial court determined that the event here could reasonably fall within the definition of an involuntary withdrawal, then it was for the jury to decide whether the withdrawal was involuntary regardless of the deliberate act on the part of the plaintiff to withdraw. If the jury decided that the plaintiff's withdrawal was involuntary to the extent withdrawal was forced upon him by the passage of the resolution, then the separation benefits provision was triggered and the Firm was liable for the stipulated amount of damages.

We agree with the trial judge that at best the "involuntary withdrawal" provision was ambiguous and, thus, presented a question for the jury to resolve. The "involuntary withdrawal" provision was capable of being understood as applying to a withdrawal of a partner when his withdrawal is required by the requisite vote of the other partners or where the action taken by the requisite vote of the other partners forced, but did not compel, the withdrawal of a partner. Contrary to the Firm's implied argument, the express provisions of the agreement do not, as a matter of law, require that at least 67% of the partners "vote to terminate" the plaintiff as a partner with the Firm before separation benefits are owed. The jury was well within its province to conclude that the event involving the plaintiff was no different than the forced withdrawal of equity partners in 1995. That these same 1995 partners could have been subsequently rehired as nonequity partners would not in any way have called into question their receipt of separation benefits. That the plaintiff was "welcome to, and indeed expected to, practice law at the firm

15

after January 1, 1997" as a nonequity partner did not preclude the jury from deciding that the plaintiff was entitled to separation benefits because he was forced to withdraw by the passage of the resolution by at least 67% of the partners.

The trial court was correct to let the jury decide; it decided that the withdrawal was involuntary. Evidence was presented in favor and against such an interpretation. That assessment of the evidence precludes a judgment n.o.v. See. Maple v. Gustafson, 151 Ill. 2d 445, 453 (1992) ("In ruling on a motion for a judgment n.o.v., a court does not weigh the evidence").

To be clear, we agree with the trial court that the controlling provision for purposes of requiring the payment of separation benefits was ambiguous as a matter of law. Once ambiguity is found, and conflicting extrinsic evidence is introduced with respect to the parties' intent, it is for the jury to determine whether the plaintiff's departure from the Firm is involuntary. See Farm Credit Bank of St. Louis, 144 Ill. 2d at 447. The jury concluded that the plaintiff's withdrawal from the Firm was involuntary, a determination we see no basis to challenge based on the record evidence. The trial court properly denied the Firm's motion for judgment n.o.v. on the breach of contract count.

### C. The Partner Defendants' Liability

The partner defendants contend that even if the Firm is liable to the plaintiff for separation benefits, they are not. The partner defendants argue the plain language of the partnership agreement expressly states the Firm, not the individual partners, is obligated to pay all separation benefits from its net income. As support, the partner defendants direct our attention to article VII, paragraph Q, and article IX, paragraph T, in the agreement. Article VII,

16

paragraph Q, of the agreement provides:

"If any equity partner's separation results from his or her

involuntary withdrawal, the firm shall pay to the withdrawn partner

*** a sum equal to twice his or her Base Amount."

Article IX, paragraph T, of the agreement states:

"The total payments provided by this agreement to be made

by the Chicago firm to any withdrawn partner *** shall be made

only from the net income of the firm."

The partner defendants further argue there is no evidence they agreed to become individually liable to make such a payment. Therefore, the partner defendants contend the trial court erred by instructing the jury on their individual liability for breach of contract.

The plaintiff argues that because article VII does not specifically exclude individual partners from an obligation to pay such monies, a practical reading of the section is that the Firm itself is to pay any judgment based on the article VII benefits and that only if the Firm refuses to pay, or becomes unable to pay, will the individual partners become liable. The plaintiff argues this is a fair reading of the section because partnership law provides that partners are liable for the general obligations of their partnership. See 805 ILCS 205/15 (West 1996) (provides for joint and several liability of partners).

The plaintiff contends article IX, paragraph T, of the agreement puts limits on the Firm's payments to protect the Firm's cash flow. The plaintiff argues this article would only become relevant if the Firm had agreed to make payments to him as mandated by article VII, paragraph

Q. Then, relying on article IX, paragraph T, the Firm could limit how such payments would be made to him.

The plaintiff further argues the partner defendants were parties to the contract, a fact he claims they admitted in the pleadings, and, therefore, are liable for any promise in the contract not fulfilled. The plaintiff argues the partner defendants admitted in their answer that they promised to make separation payments because they did not contest the language in his complaint alleging they made such a promise. The plaintiff argues the defendants only contested whether the plaintiff's departure from the Firm was an involuntary withdrawal requiring separation payments, not whether they personally promised to make such payments.

The partner defendants deny their pleadings admitted individual liability for separation payments. They argue the plaintiff's original complaint discussed liability under the 1991 partnership agreement. Thus, they contend their answer failing to deny liability under the 1991 agreement became irrelevant once the trial court determined the 1995 agreement controlled. They also argue merely being a party to the contract does not supersede the language of the agreement that states the Firm is responsible for making separation payments. The partner defendants find support for their argument in the jury's finding that Eisel and Bartelt were not liable for breach of contract, even though, according to the plaintiff, they were both parties to the contract.

The trial court specifically rejected the partner defendants' argument that article IX, paragraph T, of the agreement applies. The court found the partner defendants admitted an individual promise to pay in their answer by failing to deny the plaintiff's allegation. The trial

court also noted the partner defendants admitted approving and executing both the 1991 and 1995 agreements. The trial court held the partner defendants personally liable under the contract because each partner defendant signed the contract in his personal capacity. The partner defendants argue there is no evidence they signed the 1995 agreement or that they did so in their personal capacities.

Based on the express terms of the agreement, we agree with the partner defendants that the plaintiff must look to the Firm for payment. Having successfully argued that the Firm was liable to him under express provisions of the agreement at issue, the plaintiff is not free to jettison the provisions in the agreement that expressly limit the payment of separation benefits by the Firm only. We are unpersuaded that the express provision that sets the amount of separation payments to which he is entitled is enforceable, but the limitation that "the firm shall pay to the withdrawn partner" said sum is not.[1] While the plaintiff is correct that partnership law provides that partners are liable for the general obligations of their partnership, the plaintiff asserted only a contract cause of action, not one founded on partnership law. Under partnership law, to the extent a judgment is entered against the Firm, presumably all partners are jointly and severally liable for that judgment. The plaintiff does not explain why Dockterman, Fischer, McCluggage and Shuftan are the only partners that should be required to pay the plaintiff his separation benefits. In any event, being liable for a judgment amount under partnership law is an

---

[1] While not a factor in our holding, we note the Firm is well established and recovery of the damages from the Firm is not questioned.

insufficient showing that each of the remaining partner defendant is personally liable to pay damages that, under the contract, the Firm was required to pay, even though the partner defendants played a role in the breach of the contract itself. We are unpersuaded by the plaintiff's contention that paragraph T of article IX is only relevant if the Firm had agreed to make payments to him as mandated by paragraph Q of article VII.

We are also unpersuaded that personal liability for breach of contract on the part of the partner defendants could be based on a purported admission by the defendants in their answer. Either the sued party has a duty under the contract or the party does not. We cannot leap over the terms of the contract to the partner defendants' answer to determine whether liability under the contract lies. "It is well settled that where, as here, a written agreement purportedly represents the parties' complete expression of their relationship, neither is at liberty to modify any of its terms by parol evidence." Day v. Avery, 548 F.2d 1018, 1025 (D.C. Cir. 1976).

We agree with the partner defendants that judgment n.o.v. should have been entered in their favor on the breach of contract count as insufficient evidence was presented to establish that each partner defendant was a party to the contract. This is a contract action and only those parties to the contract have a duty under the contract, the breach of which would result in liability. Our review of the record fails to disclose any evidence that each of the partner defendants, in his personal capacity, was a party under the partnership agreement.

Accordingly, we find the partner defendants are entitled to judgment n.o.v. on the breach of contract claim.

## II. Breach of Fiduciary Duty

The plaintiff alleged the partner defendants breached their fiduciary duties by:

"(a) not advising the partners of the July amendment to the guaranty;

(b) advising the partners that Kehoe was unwilling to sign a guaranty;

(c) not advising that not all partners supplied personal financial statements;

(d) implying that the firm's financing was in jeopardy because the failure to sign;

(e) not advising partners that there might be a satisfactory resolution;

(f) recommending the conversion resolution because of a desire to terminate Kehoe's partnership; and

(g) providing a pretextual rationale for the resolution."

The partner defendants' response is twofold: the plaintiff failed to present any evidence to support an alleged breach of a fiduciary duty and, second, assuming a breach, there is no evidence that their alleged breach of any fiduciary duty proximately caused any injury to the plaintiff. See Martin v. Heinold Commodities, Inc., 163 Ill. 2d 33, 59-60, 643 N.E.2d 734 (1994) (proximate cause is a necessary element in breach of fiduciary duty action). Thus, the partner defendants argue judgment n.o.v. is warranted.

The trial court informed the jury the plaintiff had to prove the partner defendants' actions adversely influenced the resolution seeking to terminate his equity partnership in order to prevail on this claim. In denying the defendants' motion for judgment n.o.v., the court found the evidence was sufficient to present this issue of fact to the jury.

To begin our discussion, we seriously question whether the allegations relied upon by the plaintiff are sufficient to raise a violation of a duty owed between law firm partners as fiduciaries. "An examination of the case law on a partner's fiduciary duties *** reveals that courts have been primarily concerned with partners who make secret profits at the expense of the partnership. Partners have a duty to make a full and fair disclosure to other partners of all information which may be of value to their partnership." Day v. Sidley & Austin, 394 F. Supp. 986, 993 (D.D.C. 1975), citing 1 R. Rowley on Partnership §20.2, at 512-13 (2d ed. 1960). "The essence of a breach of fiduciary duty between partners is that one partner has advantaged himself at the expense of the firm." Day, 394 F. Supp. at 993. In a different context, our supreme court has made similar observations regarding fiduciary obligations involving a partnership business. "The fiduciary relation prohibits all forms of trickery, secret dealings and preference of self in matters relating to and connected with a partnership and joint venture." Bakalis v. Bressler, 1 Ill. 2d 72, 79, 115 N.E.2d 323 (1953), citing Seligson v. Weiss, 222 A.D. 634, 227 N.Y.S. 338 (N.Y. App. Div. 1928); Dike v. Martin, 85 Okla. 103, 204 P. 1106 (1922).

The allegations set forth by the plaintiff do not come remotely close to the fundamental duty recognized by the court in Day and noted by our supreme court in Bakalis that involves "secret dealings" against the partnership interests. There is no allegation, much less evidentiary

22

support, that whatever wrongful action the partner defendants engaged in at the November 25, 1996, meeting somehow deprived the partnership of profits it would have otherwise have earned or that the partner defendants somehow advantaged themselves at the expense of the Firm. We have been presented with no authority that because the plaintiff was subject to a <u>future</u> loss in status, an event he controlled, arising from the partner defendants' actions at the meeting, that a sufficient showing has been made for a breach of fiduciary duty claim.

The requisite number of partners might well have voted in favor of the resolution even if they had been provided with the information the plaintiff contends was either concealed or misstated for the most obvious reason: to remain an equity partner, one had to agree to share the same risks with the other partners. The plaintiff elected to take a different path. His implied claim that more than 67% of the partners would not have voted to change his status had they been informed of (a) the July amendment to the guaranty, or (b) that the plaintiff was willing to sign a guaranty (though not the same one all other partners signed), or (c) that not all partners supplied personal financial statements or, finally, (d) that the firm's financing was not in jeopardy, calls us to question whether these allegations are sufficient to raise a fiduciary duty owed to the plaintiff. Allegations (e), (f) and (g) appear to be no more than an offering of speculation by the plaintiff. Nor does the plaintiff point to the evidence in the record that supports any of these allegations. In fact, we question whether the allegations on which the plaintiff relies raise even an inference of a violation of a fiduciary duty to allow the claim to be decided by a jury. See <u>American Environmental, Inc. v. 3-J Co.</u>, 222 Ill. App. 3d 242, 251, 583 N.E.2d 649 (1991) (no inference could be drawn on factual allegations in complaint that

defendant's alleged failure to conduct search was a breach of duty).

We further note, as the partner defendants point out, the plaintiff was provided an opportunity to argue his position against the adoption of the resolution at the meeting. The plaintiff either failed to present his case completely, or if he did, he failed to persuade. Having made his case to the other partners and lost, we question his right to carry on his fight based on a fiduciary duty claim to the circuit court.

Nonetheless, without expressly deciding the legal viability of the plaintiff's allegations purportedly showing a breach of fiduciary duty, we agree with the partner defendants that no evidence was adduced that their alleged breach of a fiduciary duty proximately caused the claimed injury to the plaintiff. As made clear by the circuit court's instruction to the jury on the fiduciary duty claim, at the heart of the plaintiff's fiduciary claim is the resolution itself.

The fiduciary duty claim, based on the adoption of the resolution, is only legally sufficient if coupled with the breach of contract claim. The plaintiff's damages on the fiduciary claim are based solely on the defendants' failure to pay the plaintiff separation benefits. In fact, the parties stipulated that the amount of damages to which the plaintiff would be entitled was the same under either count. We fail to see how the passage of the resolution caused, either factually or legally, the damages the plaintiff has claimed. See City of Chicago v. Beretta U.S.A. Corp., 213 Ill. 2d 351, 395-96, 821 N.E.2d 1099 (2004) ("the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause").

Had the Firm read the controlling provisions as the jury did, it would have concluded it

24

owed the plaintiff the separation benefits upon his withdrawal. With the payment of those benefits, we fail to see how a legally sufficient claim alleging a violation of a fiduciary duty based on the passage of the resolution could be made. Nor has the plaintiff suggested anything to separate his fiduciary duty claim from the damages he was awarded under his contract claim.

In a real sense, it was the plaintiff himself that triggered his damages when he elected to withdraw from the Firm because, as the defendants made clear, the plaintiff was "welcome to, and indeed expected to, practice law at the firm after January 1, 1997." Even after the passage of the resolution, the plaintiff could have continued practicing with the Firm as a nonequity partner, with his separation benefits "frozen at their existing level" until his involuntary withdrawal would trigger their payment. While the passage of the resolution precipitated the plaintiff's withdrawal from the Firm a month or so later, its passage did not proximately cause him the liquidated damages he has claimed. See Bermudez v. Martinez Trucking, 343 Ill. App. 3d 25, 30, 796 N.E.2d 1074 (2003) (" 'circumstantial evidence is sufficient to establish proximate cause * * * as long as the inference in question may reasonably be drawn from the evidence' and 'the mere possibility of a causal connection is insufficient to raise the requisite inference of fact' "), quoting Nowak v. Coghill, 296 Ill. App. 3d 886, 896, 695 N.E.2d 532 (1998).

The partner defendants are entitled to judgment n.o.v. on the breach of fiduciary duty claim because there is no causal connection between the passage of the resolution and the Firm's failure to pay the plaintiff separation benefits.

### III. Trial Errors

Because we find in favor of the partner defendants on the contract and fiduciary duty

No. 1-07-0435

counts, there is no need to review their arguments for a new trial based on claimed trial errors.

IV.  Award of Court Reporter Expenses

The defendants argue the trial court erred in awarding court reporter attendance and transcript fees to the plaintiff.  Section 5-108 of the Illinois Code of Civil Procedure permits a prevailing litigant to recover certain costs.  735 ILCS 5/5-108 (West 2006).  The term "costs" is not defined in the statute.     In awarding the plaintiff court reporter expenses, the trial court relied on Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co., 356 Ill. App. 3d 471, 825 N.E.2d 1246 (2005).  In Burmac, the Second District addressed whether court reporter fees are considered "court costs" as taxable under section 5-108, an issue of first impression.  Burmac, 356 Ill. App. 3d at 486.  The appellate court affirmed the trial court's award of court reporter fees as a "necessary" expense of litigation.  Burmac, 356 Ill. App. 3d at 486.  The court found the expenses taxable to the losing party because the transcripts were essential to the trial, provided a record of the trial, and benefitted both parties.  Burmac, 356 Ill. App. 3d at 486.

The defendants argue Burmac was incorrectly decided.  In so arguing, they rely on our supreme court's decision in Vicencio v. Lincoln-Way Builders, Inc., 204 Ill. 2d 295, 302, 789 N.E.2d 290 (2003).  In Vicencio, the Illinois Supreme Court explained, "It is undisputed that section 5-108 mandates the taxing of costs commonly understood to be 'court costs,' such as filing fees, subpoena fees, and statutory witness fees, to the losing party."  The supreme court addressed a trial court's power to award costs in the specific context of "the fee charged by a nonparty treating physician for attending an evidence deposition."  Vicencio, 204 Ill. 2d at 299.  In concluding the trial court did not have authority to award such an expense, the Supreme Court

26

noted "[t]he statutes allowing recovery of costs are in derogation of the common law" and, thus, "must be narrowly construed." Vicencio, 204 Ill. 2d at 300. The trial court has authority to award the prevailing party's requested expenses, only if a statute specifically designates the cost as one that may be recovered by the prevailing party. Vicencio, 204 Ill. 2d at 300-11. The defendants here argue court reporter transcript fees are not "court costs" taxable under section 5-108, but rather litigation expenses, which are not recoverable.

We agree with the defendants. Based on the supreme court's decision in Vicencio, where it made clear that court costs are only those cost commonly understood to be in the nature of "filing fees, subpoena fees, and statutory witness fees," we cannot agree that the term costs, which "must be narrowly construed," should be expanded to those costs a court may deem "necessary." Until the supreme court directs otherwise, we decline to follow the holding in Burmac.

The trial court erred in awarding court reporter expenses as court costs to the plaintiff.

IV. The Plaintiff's Cross-Appeal

On cross-appeal, the plaintiff contends the trial court erred in denying prejudgment interest under the Interest Act (the Act) (815 ILCS 205/2 (West 2006)). According to the plaintiff, he is entitled to receive prejudgment interest because the trial court awarded liquidated damages based the breach of a written agreement. The trial court agreed interest was due under the Act, but barred the plaintiff's claim because he did not file his claim before judgment was entered. In reaching its decision, the trial court relied on Kansas Quality Construction, Inc. v. Chiasson, 112 Ill. App. 2d 277, 287-88, 250 N.E.2d 785 (1969), where the court allowed

prejudgment interest but noted that the request was made after verdict but before judgment was entered.

The plaintiff disagrees with the trial court's reading of Chiasson. He directs our attention to John Kubinski & Sons, Inc. v. Dockside Development Corp., 33 Ill. App. 3d 1015, 339 N.E.2d 529 (1975), for clarification on Chiasson.

We agree with the plaintiff that the trial court read Chiasson too narrowly. The timing of the petition for interest in Chiasson was not critical because "the Act, where applicable, will be read into the complaint." (Emphasis added.) Chiasson, 112 Ill. App. 2d at 288. In Dockside Development Corp., we rejected the argument to limit the holding of Chiasson to award interest to cases only where the petition for interest was filed before judgment was entered to be a "distinction *** without a difference." Dockside Development Corp., 33 Ill. App. 3d at 1024. Because the contract was a written instrument within the meaning of the statute, the contract was breached, and the damages were liquidated, we held in Dockside Development Corp. that the plaintiff was entitled to interest. Dockside Development Corp., 33 Ill. App. 3d at 1024. We find the same result is warranted here.

The plaintiff is entitled to prejudgment interest on the liquidated damages, to which the parties stipulated.

CONCLUSION

On the defendants' appeal, we affirm the judgment of the circuit court on the breach of contract count as to the Firm only. We reverse the circuit court in all other respects.

With respect to the plaintiff's cross-appeal, the judgment of the circuit court denying the

plaintiff's motion for interest is reversed and remanded with directions to award interest under the Interest Act to the date of the breach.

Affirmed in part and reversed in part; cause remanded.

R. GORDON, P.J., and HALL, J., concur.

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**

---

ROBERT E. KEHOE, JR.
     **Plaintiff-Appellee and Cross-Appellant,**

**v.**

**WILDMAN, HARROLD, ALLEN & DIXON, JOHN L. EISEL, MICHAEL L. McCLUGGAGE, ROBERT L. SHUFTAN, MICHAEL DOCKTERMAN, AND DAVID J. FISCHER,**
     **Defendants-Appellants and Cross-Appellees,**

**and**

**RICHARD BARTELT,**
     **Defendant.**

---

**No. 1-07-0435**

**Appellate Court of Illinois
First District, First Division
Filed: December 15, 2008**

---

**JUSTICE GARCIA delivered the opinion of the court.**

**R. GORDON, P.J., and HALL, J., concur.**

---

**Appeal from the Circuit Court of Cook County
Honorable Mark Lopez, Allen S. Goldberg, Judge Presiding**

---

| | |
|---|---|
| **For PLAINTIFF-APPELLEE**<br>**and CROSS-APPELLANT** | **Michael W. Rathsack**<br>**111 West Washington, Suite 962**<br>**Chicago, IL 60602** |
| **For DEFENDANTS-APPELLANTS**<br>**and CROSS-APPELLEES** | **Michael T. Trucco**<br>**George M. Hoffman** |

30

**Julie N. Howie**
**Stamos & Trucco LLP**
**30 West Monroe Street, Suite 1600**
**Chicago, IL 60606**