# ILLINOIS OFFICIAL REPORTS

### Appellate Court

---

***Gonzalez v. Second Federal Savings & Loan Ass'n*, 2011 IL App (1st) 102297**

---

| | |
|---|---|
| Appellate Court Caption | RAFAEL GONZALEZ, Plaintiff-Appellee, v. SECOND FEDERAL SAVINGS AND LOAN ASSOCIATION, Defendant-Appellant (Hector Gonzalez, Individually, and as Executor of the Estate of Juana Gabriela Martinez, Third-Party Defendant). |
| District & No. | First District, Sixth Division<br>Docket No. 1–10–2297 |
| Filed | June 10, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action by decedent's cousin alleging that he was the beneficiary of four payable on death accounts decedent opened at defendant savings and loan association and that the association, without authorization, paid the proceeds of two of the accounts to the executor of the estate of decedent's daughter, the trial court properly entered a judgment for plaintiff that included prejudgment interest, notwithstanding the association's contention that plaintiff failed to present clear and convincing evidence that decedent changed the beneficiary of the accounts from her daughter to plaintiff by adding language to the original certificates of deposit naming plaintiff as the beneficiary. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05–L–1827; the Hon. Henry R. Simmons, Jr., Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Adrian Mendoza and Edward R. Sherman, both of Lillig & Thorsness, Ltd., of Chicago, for appellant.

Gilbert W. Gordon, Peter J. Miller, and Richard R. Gordon, all of Gordon Rappold & Miller LLC, of Chicago, for appellee.

Panel

JUSTICE McBRIDE delivered the judgment of the court, with opinion. Presiding Justice Garcia and Justice Cahill concurred in the judgment and opinion.

**OPINION**

¶ 1 In February 2005, plaintiff filed a two-count complaint against defendant Second Federal Savings and Loan Association for conversion and breach of fiduciary duty. Plaintiff later amended his complaint to include an additional count of breach-of-contract third-party-beneficiary action. Plaintiff alleged that he was the beneficiary of four accounts opened at Second Federal and that Second Federal, without authorization, paid the proceeds of two of the accounts to the third-party defendant Hector Gonzalez,[1] as the executor of the estate of Juana Gabriela Martinez. Following a July 2010 bench trial on the breach-of-contract third-party-beneficiary count, the trial court found in favor plaintiff and awarded him $111,045.

¶ 2 Second Federal appeals, arguing that (1) the trial court erred in finding in favor of plaintiff because the evidence was insufficient to establish that plaintiff was the rightful beneficiary of two accounts at Second Federal; and (2) the trial court erred in awarding prejudgment interest when plaintiff did not request that relief in his complaint.

¶ 3 Plaintiff's first amended complaint alleged that he was the executor of the estate of Gaby Gonzalez (Gonzalez), his cousin. In October 1999, Gonzalez opened two accounts at the Archer Avenue branch of Second Federal, account number 008–07–9–001137–5 (375) and 008–07–9–001135–9 (359) (collectively, 1999 accounts). In November 2000, Gonzalez opened two more accounts with Second Federal at the Pulaski branch, account number 001–07–9001626–4 (264) and account number 001–07–9001627–2 (272) (collectively, 2000 accounts). When the four accounts were opened, Gonzalez designated her daughter, Juana Gabriela Martinez, as the beneficiary.

¶ 4 The complaint further alleged that on March 1, 2001, Gonzalez changed the beneficiary of all four accounts to plaintiff. On August 22, 2001, Gonzalez died from terminal cancer. On September 29, 2001, plaintiff closed the 2000 accounts and the proceeds were paid to

---

[1]Hector Gonzalez is not a party to this appeal.

plaintiff. Martinez died of terminal cancer on September 30, 2001.

¶ 5		On November 15, 2001, plaintiff requested Second Federal to draft a check to pay for Gonzalez's funeral costs from one of the 1999 accounts, specifically account number 375, which Second Federal issued. Later in 2001, plaintiff asked Second Federal to prepare a check to pay attorney fees associated with Gonzalez's estate and Second Federal again issued a check from account number 375, one of the 1999 accounts.

¶ 6		In December 2003, plaintiff sought to close the 1999 accounts, but Second Federal informed him that the accounts had been closed and the proceeds were paid to Hector Gonzalez, Martinez's boyfriend and no relation to plaintiff or Gonzalez.

¶ 7		Plaintiff's complaint alleged three counts against Second Federal: count I for conversion, count II for breach of fiduciary duty, and count III for breach of contract third-party-beneficiary action. Plaintiff sought $80,473.47, the proceeds of the 1999 accounts. In October 2009, the trial court dismissed the conversion count from plaintiff's complaint in its ruling on the parties' cross-motions for summary judgment. The court's written decision also indicated that plaintiff withdrew count II (breach of fiduciary duty) during the hearing on the motion for summary judgment. As for count III (breach of contract third-party beneficiary), the trial court found that a question of material fact existed and denied both parties' requests for summary judgment as to this count.

¶ 8		On July 29, 2010, a bench trial was conducted on plaintiff's breach-of-contract third-party-beneficiary claim. A new trial judge presided over the bench trial. The following evidence was presented at the trial.

¶ 9		Plaintiff testified with the aid of an interpreter. He stated that he resided in San Luis Potosi, Mexico. He testified that he was related to Gaby Gonzalez. They were cousins through their fathers. Gonzalez was also from Mexico, but she moved to Chicago in the 1970s. Plaintiff maintained contact with Gonzalez through visits and the telephone. He was also acquainted with Gonzalez's daughter, Juana Martinez. Plaintiff called Martinez "his niece."

¶ 10		Plaintiff stated that he was aware of Gonzalez's real estate. He said that she owned a building with a beauty salon, which Gonzalez operated.

¶ 11		Plaintiff learned in 1999 that Martinez had cancer. Later, in March 2001, plaintiff spoke with Gonzalez over the phone and was informed that Gonzalez had cancer. Gonzalez invited plaintiff to visit in June 2001 for a party in honor of Martinez's birthday. Plaintiff described Gonzalez's condition as "very delicate" and "frail." He said "she didn't look well." Plaintiff stated that he returned at the end of July and Gonzalez's condition was worse. When he came to Chicago at the beginning of August, Gonzalez was at a "cancer hospital" in Waukegan, but was transferred to Rush. Plaintiff testified that Gonzalez was released to go home when the doctors felt "that they had no more recourse."

¶ 12		Plaintiff stated that he had conversations with Gonzalez about her estate. She told him that her documents were kept in a bag in a bedroom closet. The documents included her will and certificates of deposit. Plaintiff testified that Gonzalez told him that he was to receive the documents. Gonzalez died on August 22, 2001. Plaintiff arranged the funeral.

¶ 13		Plaintiff identified four exhibits as the original certificates of deposit that Gonzalez left

him. All four of the certificates indicated that "Gaby Gonzalez" was the account holder. The trustee language included a change. For the 1999 accounts, the trustee language stated, "GABY GONZALEZ AS TRUSTEE FOR: ~~JUANA GABRIELA MARTINEZ~~," and beneath that it said, "RAFAEL GONZALEZ." For the 2000 accounts, the first line of the trustee language stated, "~~AS TRUSTEE FOR: JUANA GABRIELLA MARTINEZ~~," and beneath it a second line was added, "AS TRUSTEE FOR: RAFAEL GONZALEZ." Additionally, a line was typed at the top of each of the four certificates, stating: "REVISED BENEFICIARY 03/01/01 RC." The certificates for the 1999 accounts each listed an opening balance of $50,000, while the certificates for the 2000 accounts each listed an opening balance of $60,000.

¶ 14    Plaintiff stated that he cashed the certificates for the 2000 accounts in September 2001 at the Pulaski branch. He testified that he used the money for expenses for Martinez's funeral and the care of Gonzalez's stepmother, who lived in Mexico. Plaintiff presented the withdrawal slips for each of the accounts as an exhibit and it stated that $63,515.99, was withdrawn from each of the 2000 accounts, and included plaintiff's signature and the date of September 29, 2001. The 2000 accounts were then closed. Plaintiff testified that the bank employee did not look at any records or review any other documents before she gave plaintiff the check.

¶ 15    Plaintiff stated he returned to Second Federal on November 15, 2001. He sought a check to pay the funeral home. He said he took the certificates for the 1999 accounts, his identification, the "payment slip from the funeral," and Gonzalez's death certificate. He spoke with an employee and told her he wanted to issue a check to pay the funeral services because he did not have a checking account. He said she looked over the documents, went inside the bank, and then came back with a check. Plaintiff testified that no one indicated to him that there was a question whether he was the beneficiary of this account. He did not speak with any other employee of Second Federal. An exhibit was presented that showed a copy of a check for $9,606.48, payable to Fortuna Brothers, as well as a copy of the teller receipt indicating payment from account number 375 and plaintiff's signature.

¶ 16    Plaintiff testified that he returned to Second Federal on December 6, 2001, to obtain a check for attorney services on Gonzalez's estate. He said he brought the certificates, his identification, and the bill from the attorney. He spoke with an employee. She did not ask him any questions, but instead she looked at plaintiff's documents, went into the back of the bank, and came back with a check. A copy of the teller receipt with the account number and plaintiff's signature and a copy of the check, payable to Owens, Owens & Rinn, Ltd., in the amount of $22,526.50, were presented as exhibits. The teller receipt had a handwritten note, "Approved by Gigi," under the section for "Teller's I.D." The receipt also indicated that the money was drawn from account number 375. Again, plaintiff stated that no one asked him about his right to withdraw funds under the certificate.

¶ 17    Plaintiff stated his next visit to Second Federal was in July 2003. He spoke with an employee at a desk. He brought the certificates and asked if the accounts were still open and what the amounts were. Plaintiff said the employee informed him that the accounts were open and he could go to a teller. Plaintiff did not withdraw any money that day.

¶ 18    In December 2003, plaintiff returned to the bank. He brought the certificates and his identification. He spoke with a teller and asked to close the accounts. He stated that the teller looked in the system and told him the accounts were closed. Plaintiff testified that he told her that was "impossible" because he had the original certificates. She went inside the bank and came back with two people. They explained to plaintiff that the money had been paid to Hector Gonzalez.

¶ 19    On cross-examination, plaintiff admitted that he did not have any firsthand knowledge of Gonzalez's actions with Second Federal. He was not present at Second Federal with Gonzalez. Plaintiff stated no one at Second Federal informed him that he was not designated as the beneficiary on the 1999 accounts. Plaintiff admitted that he was not the executor of Martinez's estate; she had named Hector as her executor. Plaintiff stated that other than the certificates, he has not seen any other bank documents that reflected him as the beneficiary of the 1999 accounts.

¶ 20    Mary Turk testified for plaintiff's case. She stated that she formerly worked for Second Federal for 43 years. At the time she left Second Federal, Turk handled miscellaneous matters pertaining to "EFT" operations, checking operations, legal files and was in charge of office supply purchases. She also handled general customer problems. Turk did not supervise the tellers, but the tellers did come to her with questions. In 1999 and 2000, Turk was an assistant vice-president of Second Federal.

¶ 21    Turk identified the certificates of deposit on the 1999 and 2000 accounts. She stated that the certificates are issued when the account is opened and they are similar to a passbook-type of instrument. Turk was asked what the notation of "REVISED BENEFICIARY 03/01/01 RC" meant. Turk answered, "That means that the owner, Gaby Gonzalez, was the account holder at that time, came in to change the beneficiary on these accounts. That was her intent, and it was typed this way by this–the letters, RC." Turk stated that Rosa Cavilla worked in the new accounts area of the bank at that time.

¶ 22    Turk was also asked about the portion in which the language naming Martinez as trustee was crossed out and plaintiff's name was added as trustee. Turk stated that "it's not the way it should have been done, but it's the way that Rosa did it." Turk testified that this method had been used in prior years, but the preferred way was to issue a new certificate and a new signature card, "but this is what was done at this time." Turk admitted that she did not believe there were any written procedures on how to change beneficiaries on certificates of deposit. Turk stated that a new signature card should have been issued and the account owner should have initialed the change.

¶ 23    Turk also testified that the signature cards from the 2000 accounts were signed twice, but Gonzalez did not initial where the beneficiary was changed. Copies of the signature cards were presented as exhibits. These signature cards included the language "REVISED BENEFICIARY 03/01/01 RC" and Martinez's name was crossed out and plaintiff's name was added in the section for beneficiary.

¶ 24    Turk stated that the account numbers for the 1999 accounts indicated that the accounts were opened at a different branch, the Archer Avenue office, and the original signature cards would have been maintained at that location. Despite this, Gonzalez would have been able

to change the beneficiaries at the Pulaski office, but certain steps should have been done, such as contacting the Archer branch, asking them to pull the signature cards, and preparing new signature cards. Turk admitted that there were no procedures to perform these tasks. Turk also stated that it would not have been proper to return the certificates to the account holder unless all the steps to change the signature card had been completed.

¶ 25    Turk reviewed a copy of Gonzalez's customer profile presented as an exhibit. The message section stated: "GABY GONZALEZ DECEASED 08/22/01. REVISED BENEFICIARY 03/01/01 RAFAEL GONZALEZ. PLEASE USE CAUTION 09/21/01. ANY QUESTIONS SEE GIGI. 09/21/01 MNG." Turk testified that "MNG" was Myra Garza and that she was "GIGI." She said this entry was on the computer system and it listed all four accounts.

¶ 26    Turk stated that she believed she was the person who approved plaintiff's requests for checks to Fortuna Brothers and Owens, Owens & Rinn, Ltd. Turk testified that she approved plaintiff's request to close the 2000 accounts in September 2001.

¶ 27    Turk testified that she met Martinez once. Martinez came to Second Federal and sought to withdraw money as the beneficiary, but Turk saw the accounts listed plaintiff as the beneficiary. Turk stated that she felt bad for Martinez as she was "very ill," but she did not have the certificates of deposit or a death certificate. Turk stated that she was aware the money in the 1999 accounts was paid to Hector as the trustee for Martinez's estate, but she did not approve the payout.

¶ 28    On cross-examination, Turk admitted that she never met Gonzalez and did not assist her when she came to Second Federal. She conceded that she does not have any personal knowledge of Gonzalez's intent. She stated that after there were questions on the accounts, she spoke with Rosa Cavilla about the notations, but Cavilla did not have any recollection of anything. Turk also said that she did not believe she told Martinez that she was not the beneficiary on the 1999 accounts, which had been opened at the Archer branch.

¶ 29    Turk testified that she did not recall encountering an instance in which the certificates of deposit were in conflict with the bank signature card. Turk stated she did not know which document would control. Turk further testified that the signature card "is the ultimate source of ownership of the account."

¶ 30    Turk stated that for a withdrawal to be made from the 1999 accounts, the signature cards would be reviewed. Since the signature cards for the 1999 accounts were at the Archer branch, they would have faxed copies over to the Pulaski branch. Turk agreed that this was normal custom and practice. Turk admitted that the signature cards for the 1999 accounts were lost for a period of time. Second Federal presented as an exhibit a copy of the original signature cards for the 1999 accounts which indicated Martinez as the beneficiary. One of the signature cards was unsigned by Gonzalez. Turk also noted that proxy cards for each of the 1999 accounts were signed by Gonzalez and showed Martinez as the beneficiary.

¶ 31    Turk testified that the copy of the customer profile for Gonzalez's accounts included a handwritten notation, which stated "benef–Juana Gonzalez–daughter died 9-30-01." Turk stated that the handwriting was hers. However, when asked about the typed message that indicated a revised beneficiary to plaintiff, Turk stated that she thought it applied to the

ownership of the accounts and she could not tell by looking at the message to which account it referred. Turk said she did not know for how many accounts Gonzalez requested to have the beneficiary changed when she came in on March 1, 2001.

¶ 32 Turk admitted in response to a question from the trial judge that the method of crossing out the name of beneficiary was still done "from time to time." Turk testified that she had no reason to believe that the certificates were not modified by an employee of Second Federal.

¶ 33 Following Turk's testimony, plaintiff rested. Second Federal moved for a directed finding, which the trial judge denied.

¶ 34 Gonzalo Gradilla testified that he was currently employed as the vice-president of retail banking at Second Federal and he previously held the position of chief operations officer at Second Federal. In the course of his employment, he stated that he was familiar with the forms and documents used in 1999 and 2000 for the certificates of deposit at issue. Gradilla said that he had never met plaintiff or Gonzalez, but he had met Martinez once.

¶ 35 Gradilla stated that if a customer wanted to open a certificate of deposit in 1999, he or she would be issued "a hardcover CD which maintains a history of the account as well as a signature card that we maintain at the branch." Gradilla identified that the applications and proxy cards for the 1999 accounts which listed Gonzalez as the primary owner and Martinez as the beneficiary. Gradilla also identified the signature cards, which were maintained at the Archer branch. Gradilla admitted that over the course of the litigation, there was a period of time when the signature cards could not be located. He said the bank launched an investigation and found the cards in a box for closed account signature cards.

¶ 36 Gradilla testified that "account ownership is always supported by the signature card[,] which is a contract with our customer." Gradilla stated the bank would not rely on the certificates in the case of a conflict. Gradilla admitted that he was not party to any discussions with Gonzalez on March 1, 2001, and did not have any personal knowledge of what she may have told a Second Federal employee about what she wanted done with her four accounts. He did not know why there are four certificates that show a revised beneficiary, but only two signature cards that showed a revised beneficiary.

¶ 37 Gradilla also stated that he was "part of the process" in approving the closing of the 1999 accounts and issuing payment to Hector in June 2002. He said his participation was that Turk informed him that since they had signature cards that mentioned Martinez as the beneficiary, Hector would be bringing executor documentation to show that he was the executor of the estate of Juana Martinez, and that on the day he came in, Hector would have access to the accounts. Gradilla testified that when Hector came to the bank, they reviewed the signature cards, his identification and his designation as executor of the estate. Gradilla admitted that Hector did not have the actual certificates for the 1999 accounts. Instead, Gradilla had Hector sign a "lost passbook affidavit," which indicated that he did not have possession of the certificates. Gradilla stated that during their investigation, no modified or amended signature cards were found for the 1999 accounts.

¶ 38 On cross-examination, Gradilla admitted that he did not play a very big role in approving the payout to Hector. He stated that he did not know that plaintiff had the original certificates

and admitted that if he had known there was a question as to who the funds belonged to, they would not have paid out. Gradilla responded to a question from the trial judge that the font used on the certificates was one used on the bank's typewriters.

¶ 39      Myra Garza testified that she was currently employed as the retail operations manager for Second Federal. She stated that from 1993 to 2005, she was a supervisor for Second Federal. Garza admitted that the initials MNG from the customer profile message were hers. She said that she inputted the message into Gonzalez's customer profile in the computer system. The message was entered on September 21, 2001, and all of it was entered at one time. Garza stated that "the purpose of this message [was] to alert the teller to use caution before proceeding with any transactions." Garza testified that she received this information from someone else and it was not her firsthand knowledge. She said she received this information from Turk.

¶ 40      Garza admitted on cross-examination that a person would not be permitted to complete a lost passbook affidavit and close the account if the bank employees knew a third party was in possession of the certificates. Garza also testified that the change to the certificates was a method used by Second Federal in 2001. Garza stated that a customer would not have been allowed to leave the bank with the certificates until all the procedures were complete to change the beneficiary, which included signing a new signature card indicating a change of beneficiary. Garza conceded that Second Federal did not have any written procedures in 2001 for changing the names of beneficiaries on the certificates of deposit.

¶ 41      Garza testified that she was not present when the accounts were changed in March 2001. Garza stated it was possible for a customer to change his or her mind about changes to his or her accounts and leave the bank without signing a signature card. She said the transaction would not be complete. However, Garza also said the certificates would reflect his or her wishes as of that day and he or she would need to come back with certificates to change his or her account again.

¶ 42      After Garza's testimony, Second Federal entered a stipulation that Hector was issued two checks: one in the amount of $23,841.49, for account 375 and one for $56,631.98, for account 359. Both sides then rested. Following closing arguments, the trial judge made his finding that the plaintiff proved his case by clear and convincing evidence. The judge noted that he listened very closely to the testimony and observed the witnesses' demeanor and that he was also "intimately familiar with the exhibits allowed into evidence by both sides." The judge entered an award for plaintiff in the amount of $111,045, which included prejudgment interest. The judge also entered judgment against Hector in a third-party action for that amount.

¶ 43      This appeal followed.

¶ 44      On appeal, Second Federal argues that the trial court erred in finding in favor of plaintiff because the evidence failed to establish by clear and convincing evidence that plaintiff was the beneficiary of the 1999 accounts.

¶ 45      After a bench trial, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010). "The reviewing court gives great deference to the trial court's

findings because, as the trier of fact, the trial court is in a superior position to observe the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive." *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 121-22 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is apparent or if the finding appears to be arbitrary, unreasonable or not based on the evidence. *Southwest Bank*, 401 Ill. App. 3d at 890; *Moyer*, 347 Ill. App. 3d at 122.

¶ 46    All of the accounts created by Gonzalez were payable on death (POD) accounts, also known as Totten trust accounts. "A Totten trust is created when a deposit is made by a person (the holder) of his or her own money in his or her own name as trustee for another." *In re Estate of Weiland*, 338 Ill. App. 3d 585, 589 (2003) (citing *In re Estate of Davis*, 225 Ill. App. 3d 998, 1005 (1992)). "[W]here a decedent, during his lifetime, executes an instrument creating a bank account in his or her own name as trustee for another, there is a presumption that the decedent intended to create a [POD] trust in favor of the named beneficiary or beneficiaries." *Weiland*, 338 Ill. App. 3d at 597 (citing *In re Estate of Petralia*, 48 Ill. App. 2d 122, 136 (1964), *aff'd*, 32 Ill. 2d 134 (1965)).

¶ 47    In determining the proper burden of proof in cases involving a Totten trust account, the *Weiland* court reviewed cases involving joint accounts. The court concluded that the same burden of proof should be applicable to both joint accounts and Totten trust accounts. *Weiland*, 338 Ill. App. 3d at 597-98. Thus, "a written instrument executed by the holder expressing his or her intent to create a POD account raises the presumption of the holder's intent, and such presumption may be overcome only by clear and convincing evidence. However, in the absence of a written instrument executed by the holder, the claimant must show the holder's intent to create a Totten trust by clear and convincing evidence." *Weiland*, 338 Ill. App. 3d at 598.

¶ 48    The statute governing POD accounts does not specify the signature card as the controlling instrument when changing beneficiaries.

¶ 49    Section 4(a) of the Illinois Trust and Payable on Death Accounts Act states:

"If one or more persons opening or holding an account sign an agreement with the institution providing that on the death of the last surviving person designated as holder the account shall be paid to or held by [one or more designated beneficiaries], the account, and any balance therein which exists from time to time, shall be held as a payment on death account and unless otherwise agreed in writing between the person or persons opening or holding the account and the institution:

(a) Any holder during his or her lifetime may change any of the designated [beneficiaries] to own the account at the death of the last surviving holder without the knowledge or consent of any other holder or the designated beneficiaries by a written instrument accepted by the institution[.]" 205 ILCS 625/4(a) (West 2002).

¶ 50    The cardinal rule in construing a statute, to which all others are subordinate, is to ascertain and give effect to the intent of the legislature. *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008). To determine legislative intent, we turn to the language of the statute, which is the best indicator of its intent. *Alvarez*, 229 Ill. 2d at 228.

¶ 51    Section 4(a) specifically allows a holder to change the beneficiary on a POD with "a written instrument accepted by the institution." 205 ILCS 625/4(a) (West 2002). See also *Weiland*, 338 Ill. App. 3d at 603 ("neither a signature card nor any other particular form of writing is required by the statute. Instead, the record must establish the existence of a writing expressing the intent of the holder to establish a POD account."). The crux of Second Federal's argument is that the signature cards for the 1999 accounts are the only written instrument that can demonstrate a change of beneficiary. However, we first note that the signature card for account number 375 was never signed by Gonzalez. Thus, the only document which supports Second Federal's assertion is the signature card for account number 359. Moreover, the evidence presented at trial showed that Second Federal and its employees allowed money to be withdrawn from the accounts without a signature card and relied on the certificates of deposit to substantiate plaintiff's claim as a beneficiary. These actions support a finding that the certificates of deposit constitute "a written instrument accepted by the institution" for a holder to indicate a change of beneficiary.

¶ 52    Plaintiff submitted multiple documents indicating Gonzalez's intention to change the beneficiary on all accounts. All four certificates of deposit indicate that the beneficiary was changed to plaintiff on March 1, 2001. Second Federal employees testified that the font used to type in the changes was from a Second Federal typewriter. Additionally, the customer profile for Gonzalez listed all four accounts and included a message that the beneficiary was changed to plaintiff on March 1, 2001. Plaintiff also presented the signature cards for the 2000 accounts which have Martinez's name crossed out and plaintiff's name typed underneath. However, no new signature card was issued, as Second Federal contends was required, nor did Gonzalez initial the changes on the cards. We note that the 2000 accounts were opened at the Pulaski branch, which was the location where Gonzalez went to change the beneficiaries.

¶ 53    Turk testified that there were no written procedures on how to change a beneficiary. She stated that new signature cards should have been issued instead of simply crossing out Martinez's name and adding plaintiff's name because doing it that way is "not the way it should have been done, but it's the way that Rosa did it." She also noted that this method of crossing out the prior beneficiary and typing in a new one had been used in prior years. Turk further stated that Gonzalez would have been able to change the beneficiary on the 1999 accounts, which were opened at a different branch, at the Pulaski branch, but the bank employees would need to follow certain steps to change the signature cards. Again, Turk admitted there were no procedures for employees to perform these tasks.

¶ 54    Evidence was also presented through exhibits and witness testimony that Second Federal permitted plaintiff to use funds from the 1999 accounts to pay bills for Gonzalez's estate. A check was issued first for the funeral home and later a check for the attorneys for the estate. Plaintiff testified that when he went to Second Federal for these checks he presented his identification, the certificates of deposit and the invoices. He was not questioned about his right to withdraw funds from the accounts. These transactions indicate that Second Federal considered the certificates of deposit listing plaintiff as the beneficiary to be sufficient documentation to release funds. Second Federal asserts that the invoices were paid because they were billed to Martinez and the checks were issued directly to the third-party creditors,

but we are not persuaded because at the time of the transactions, plaintiff did not present any documents showing that he was authorized to withdraw funds on Martinez's behalf and employees did not question plaintiff about his ownership of the accounts. Further, plaintiff testified that he had the checks prepared in the name of the creditors because he did not have a checking account.

¶ 55    Under the facts of this case, Second Federal, through the actions of its employees, permitted Gonzalez to change her beneficiary to plaintiff and then gave plaintiff access to the funds without any question as to the signature card. Since the statute governing POD accounts allows for the change in beneficiary on a written instrument accepted by the institution, the certificates of deposit were sufficient proof of the beneficiary change and Second Federal acknowledged the certificates as such when it permitted plaintiff to withdraw funds as the beneficiary. Given this evidence of documentary intent and the actions by Second Federal recognizing plaintiff as the beneficiary, we do not find that the opposite conclusion is apparent nor was the trial court's finding arbitrary, unreasonable or not based on the evidence. Accordingly, we hold that the trial court's findings were not against the manifest weight of the evidence and affirm its award in favor of plaintiff.

¶ 56    Finally, Second Federal asserts that plaintiff was not entitled to prejudgment interest on the award because interest was not specifically requested in his request for relief in his complaint. Plaintiff responds that Illinois law did not require him to specifically request interest in count III of his complaint.

¶ 57    Section 2 of the Interest Act provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this Section on behalf of a creditor." 815 ILCS 205/2 (West 2002).

¶ 58    "Prejudgment interest need not be requested in the complaint in order to be recoverable under the Interest Act; when the evidence at trial establishes that a party is entitled to prejudgment interest under the Interest Act, a request for such interest will be read into the complaint." *Prignano v. Prignano*, 405 Ill. App. 3d 801, 821-22 (2010) (citing *Kehoe v. Wildman, Harrold, Allen & Dixon*, 387 Ill. App. 3d 454, 473 (2008); *Boyd v. United Farm Mutual Reinsurance Co.*, 231 Ill. App. 3d 992, 1000 (1992) ("Contrary to the defendant's argument, the mere fact that plaintiffs' complaint did not ask for interest was of no moment, since interest is provided by statute and will be read into the complaint.") *Madison Park Bank v. Field*, 64 Ill. App. 3d 838, 843 (1978) ("The fact too that the complaint did not ask for interest is of no moment, since the same is provided for by statute and will be read into the complaint.")

¶ 59      Here, Second Federal deprived plaintiff as the beneficiary the funds from the 1999 accounts and the trial court properly read a request for prejudgment interest under the Interest Act into the complaint. Therefore, we affirm the trial court's award of prejudgment interest.

¶ 60      Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 61      Affirmed.