# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Fairfield National Bank v. Chansler**, 2013 IL App (5th) 110530

---

| | |
|---|---|
| Appellate Court Caption | FAIRFIELD NATIONAL BANK, Plaintiff-Appellee, v. ABIGAIL CHANSLER and CORDELIA CHANSLER, Defendants-Appellees, and BELINDA MUNSELL, Individually and as Independent Executor of the Estate of Malinda G. Munsell, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-11-0530 |
| Filed | January 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an interpleader action filed by plaintiff bank seeking a determination of the rights to two certificates of deposit with payable-on-death provisions opened by the mother of the defendant executor naming two of defendant's daughters as beneficiaries, the trial court erred in finding that the beneficiaries had not been changed when the bank received and processed the paperwork defendant's mother mailed to the bank making defendant the beneficiary of the certificates one day after defendant's mother died, since the bank had authority to accept the written instruments and respond to the intentions of defendant's mother, and if the trial court determines on remand that the bank did so, the change should be deemed effective. |
| Decision Under Review | Appeal from the Circuit Court of Hamilton County, No. 11-MR-02; the Hon. Barry L. Vaughan, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

| Counsel on Appeal | James L. Van Winkle, of Van Winkle & Van Winkle, of McLeansboro, for appellant. |
|---|---|
| | John P. Farrar and Abbey M. Brian, both of Farrar & Brian, P.C., of Mt. Carmel, for appellees Abigail Chansler and Cordelia Chansler. |
| | Jay H. Fyie, of Fyie & Hawkins, of Fairfield, for appellee Fairfield National Bank. |
| Panel | JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion. |
| | Justices Chapman and Stewart concurred in the judgment and opinion. |

**OPINION**

¶ 1      Plaintiff, Fairfield National Bank, filed an action in interpleader in the miscellaneous remedies division of the circuit court of Hamilton County requesting an order determining the rights of respective defendants for two certificates of deposit. The circuit court entered summary judgment in favor of defendants Abigail and Cordelia Chansler, finding that the designated beneficiaries on the certificates of deposit had not been changed in the timely manner required by the Illinois Trust and Payable on Death Accounts Act (Act) (205 ILCS 625/1 to 15 (West 2010)). Defendant Belinda Munsell, individually and as independent executor of the estate of Malinda G. Munsell, deceased, appealed. On appeal, the issue is whether Fairfield National Bank had authority to change the beneficiaries on the certificates of deposit.

¶ 2      We reverse and remand.

¶ 3                       FACTS

¶ 4      On October 12, 2010, Malinda opened two certificates of deposit with payable-on-death (POD) provisions at Fairfield National Bank. As payable-on-death accounts, Malinda remained the holder of the accounts, but for each of the certificates she named a designated beneficiary upon her death. For one certificate, her granddaughter, Abigail Chansler, was designated a beneficiary, and on the other certificate another granddaughter, Cordelia Chansler, was named beneficiary.

¶ 5      Sometime in early March 2011, Malinda telephoned Fairfield National Bank and requested forms for changing the beneficiaries on the certificates of deposit. On March 4, 2011, Fairfield National Bank prepared and mailed to Malinda withdrawal forms, signature

-2-

cards, and confirmations of time deposit. Malinda filled in the paperwork to indicate a change of the designated beneficiary for both certificates of deposit to Belinda Munsell, Malinda's daughter and the mother of both Abigail and Cordelia. On March 12, 2011, the filled-in forms and a $10 check for a processing fee were placed in the mail. Malinda died on March 14, 2011.

¶ 6       On March 15, 2011, Fairfield National Bank received the forms, processed the paperwork, accepted the $10 check, and changed the designated beneficiary on both of the certificates of deposit, assigning new numbers to the accounts.

¶ 7       On March 22, 2011, Jeff Chansler, ex-husband of Belinda and father of Abigail and Cordelia, contacted Fairfield National Bank and informed them that Malinda had died before the date the paperwork had been processed. Jeff Chansler asserted that Abigail and Cordelia were the rightful beneficiaries of the accounts.

¶ 8       Fairfield National Bank filed this complaint in interpleader. The Chanslers filed a motion for summary judgment asserting that the certificates should have remained in the original form with each of them as designated beneficiaries on the date of Malinda's death. Belinda, individually and as the executor of the estate of Malinda, filed a motion for summary judgment asserting that Malinda had effectively changed the beneficiaries for the certificates of deposit or, alternatively, revoked the designations of the Chanslers as beneficiaries in such a manner that the assets of the account became part of Malinda's estate. The trial court entered summary judgment in favor of the Chanslers, finding that the designated beneficiaries had not been changed according to the terms of the Act.

¶ 9       Belinda appeals.

¶ 10                                          ANALYSIS

¶ 11      The underlying action is one in interpleader. The interpleading party, a bank, seeks a determination of whether it had authority to accept Malinda's request for a change of beneficiaries on two certificates of deposit. The certificates of deposit were arranged as payable on death of Malinda. Payable-on-death accounts are authorized by the Act. 205 ILCS 625/1 to 15 (West 2010). The Act, however, is ambiguous. The answer rests in the ordinary care of financial institutions.

¶ 12      Payable-on-death accounts are recognized as a useful tool for estate planning. See Helen W. Gunnarsson, *POD and TOD Accounts and Your Estate-Planning Arsenal*, 95 Ill. B.J. 510 (2007). This was not always so. Such accounts are often referred to as Totten trusts–after precedent establishing their validity. *In re Totten*, 71 N.E. 748, 750 (N.Y. 1904). The propriety of Totten trusts was challenged in several jurisdictions because the requirements for creating such an account are not as stringent as the witnessing requirements for a will. 17 Robert S. Hunter, Illinois Practice § 38:1 (4th ed. 2007) ("The nature of the payable on death account").

¶ 13      In 1965, the Illinois Supreme Court recognized the validity of Totten trusts. *In re Estate of Petralia*, 32 Ill. 2d 134, 135, 204 N.E.2d 1, 2 (1965). *Petralia* held that the signature card for a savings account designating the holder's daughter as a beneficiary on his death was sufficient to create a valid trust despite not being witnessed as a will. *Petralia* recognized the

definition of Totten trusts provided in the Restatement (Second) of Trusts as the law of Illinois. *Petralia*, 32 Ill. 2d at 138, 204 N.E.2d at 3; Restatement (Second) of Trusts § 58 (1959).

¶ 14    Prior to the Act, the legislature authorized payable-on-death accounts in certain financial institutions through the Illinois Savings and Loan Act. Ill. Rev. Stat. 1955, ch. 32, ¶ 770. These accounts were seen as clearly testamentary. *In re Estate of Gubala*, 81 Ill. App. 2d 378, 382, 225 N.E.2d 646, 649 (1967); *Johnson v. Garellick*, 118 Ill. App. 2d 80, 83, 254 N.E.2d 597, 599 (1969). Nonetheless, the legislature exempted such payable-on-death accounts from the requirements of the statute of wills. *Johnson*, 118 Ill. App. 2d at 83, 254 N.E.2d at 599; see *In re Estate of Wright*, 17 Ill. App. 3d 894, 896-97, 308 N.E.2d 319, 321 (1974) (absence of similar provision in the Illinois Banking Act did not indicate that legislature intended to proscribe holders from creating Totten trusts at banks and other financial institutions).

¶ 15    In 1985, the General Assembly established the Act. 205 ILCS 625/1 to 15 (West 2010); Pub. Act 84-461, §§ 1-5 (eff. Jan. 1, 1986). The Act covers a broad array of financial institutions, including those under the Illinois Savings and Loan Act and the Illinois Banking Act. 205 ILCS 625/2(a) (West 2010). Certificates of deposit are specifically listed as a type of account covered by the Act. 205 ILCS 625/2(b) (West 2010).

¶ 16    Section 4 of the Act now embodies the law for "Payable on Death Account Incidents." 205 ILCS 625/4 (West 2010). The introductory paragraph authorizes a holder, or holders, of an account to enter into an agreement with a financial institution that provides for payment of the account to designated beneficiaries on the death of the last surviving holder. Sequential subparagraphs provide terms for change of the designated beneficiaries, deposits and withdrawals by the holder, and survivorship issues. 205 ILCS 625/4(a), (b), (c) (West 2010).

¶ 17    Paragraph (a) provides the procedure for the change of beneficiaries:

"§ 4. Payable on Death Account Incidents. If one or more persons opening or holding an account sign an agreement with the institution providing that on the death of the last surviving person designated as holder the account shall be paid to or held by one or more designated beneficiaries, the account, and any balance therein which exists from time to time, shall be held as a payment on death account and unless otherwise agreed in writing between the person or persons opening or holding the account and the institution:

(a) Any holder during his or her lifetime may change any of the designated beneficiaries to own the account at the death of the last surviving holder without the knowledge or consent of any other holder or the designated beneficiaries by a written instrument accepted by the institution[.]" 205 ILCS 625/4(a) (West 2010).

¶ 18    Applied to the circumstances at hand, paragraph (a) is ambiguous. Paragraph (a) uses the time-laden phrase "during his or her lifetime" and the past-tense verb "accepted," but is structured as applying to the actions of the holder of the account and not the financial institution. The Chanslers argue that the bank lacked authority because it did not accept the written instruments of change during the life of Malinda, the holder. Belinda contends that Malinda did all that was required of her for the "written instrument" during her lifetime and that this was sufficient for a change of designated beneficiaries.

-4-

¶ 19    The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 461, 939 N.E.2d 487, 490 (2010). The plain language of the statute is the most reliable indication of legislative intent, and when the language of the statute is clear, it should be applied as written without resort to aids or tools of interpretation. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59, 857 N.E.2d 229, 236 (2006). In instances where the application of a statute is ambiguous, courts may consider other tools of construction. *In re D.D.*, 196 Ill. 2d 405, 419, 752 N.E.2d 1112, 1120 (2001).

¶ 20    Application of tools of statutory construction reveals the provision for change of beneficiaries in the Act was intended to protect the intentions of the holder of the account, and not to set a bright-line time for the acceptance or written instruments by financial institutions. Courts should look to the purpose and meaning of terms as they are used in other statutes and the common law at the time legislation is passed. *JPMorgan Chase Bank, N.A.*, 238 Ill. 2d at 462, 939 N.E.2d at 491. The terms and provisions should be construed as a whole in order to effectuate the intent of the legislature. *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 500, 739 N.E.2d 508, 514 (2000). Both the Act as a whole and the history of payable-on-death accounts call for giving the interpleader the authority to accept Malinda's request for change of beneficiaries.

¶ 21    The more cogent reading is that the timing is addressed to the actions of the holder of the account. Grammatically, the "holder" is the actor in paragraph (a). Indeed, the ambiguity of the Act stems, in part, from the separation of the actor, "holder," from the form of action, "written instrument." When the interceding language is removed, the paragraph reads that a "holder during his or her lifetime may change any of the designated beneficiaries *** by a written instrument accepted by the institution." 205 ILCS 625/4(a) (West 2010).

¶ 22    From the perspective of an estate planner, the paragraph instructs the holder how she "may change" the designated beneficiaries. The holder, "any holder," may make the change without the consent of other holders or designated beneficiaries, but this must be accomplished "by a written instrument." The timeline for the holder's actions for this written instrument is "during his or her lifetime."

¶ 23    The origins of the phrase "during his or her lifetime" strongly suggest that the timeline extends only to the execution of the written instrument by the holder, and not to the time of acceptance by the financial institution. The common law recognition of Totten trusts in *Petralia* and the legislation that preceded the Act both shed insight on this phrase.

¶ 24    The phrase was parlance in the common law before the Act. *Petralia* adopted the definition of the Totten trust provided by the Restatement:

> "§ 58. Tentative Trust of Savings Deposit
>
> Where a person makes a deposit in a savings account in a bank or other savings organization in his own name as trustee for another person intending to reserve a power to withdraw the whole or any part of the deposit at any time *during his lifetime* and to use as his own whatever he may withdraw, or otherwise to revoke the trust, the intended trust is enforceable by the beneficiary upon the death of the depositor as to any part remaining on deposit on his death if he has not revoked the trust." (Emphasis added.) Restatement

(Second) of Trusts § 58 (1959).

¶ 25   An official comment to the Restatement explains that the phrase "during his lifetime" explains that the intent of the holder, and not any interest of potential beneficiaries, dictates the rights in the assets. In order to revoke the account, the holder need only manifest her intention. Comment c instructs courts that the intention of the holder/depositor should be honored:

> "*c. Revocation of tentative trust.* A tentative trust of a savings deposit can be revoked by the depositor at any time during his lifetime, by a manifestation of his intention to revoke the trust. No particular formalities are necessary to manifest such an intention. If he withdraws any part of the deposit during his lifetime, the withdrawal operates as a revocation of the trust to the extent of such withdrawal, and the beneficiary will be entitled only to the amount remaining on deposit at the death of the depositor." Restatement (Second) of Trusts § 58 cmt. c (1959).

If the Restatement is applied as guided by comment c, the phrases "during his lifetime" and "on his death" do not operate as timing requirements, but as a mechanism for protecting the guiding principle of the intention of the depositor/holder. In other words, any potential beneficiaries do not have a right independent of the holder/depositor's intentions. If the guidance of comment c is applied to the Act, the test is whether Malinda manifested her intentions.

¶ 26   The phrase "during his lifetime" was also used in legislation in effect prior to the Act authorizing payable-on-death accounts held in savings and loan institutions. The Illinois Savings and Loan Act provided that "[a]ny such trustee *during his lifetime* may change any of the designated beneficiaries by a written direction accepted by the association." (Emphasis added.) Ill. Rev. Stat. 1955, ch. 32, ¶ 770(b)(1). The wording of this prior legislation is similar but does not have the interceding language separating the actor, "trustee" or "holder," from the form of action, "written direction" or "written instrument." Ill. Rev. Stat. 1955, ch. 32, ¶ 770(b)(1); compare 205 ILCS 625/4(a) (West 2010).

¶ 27   Illinois courts found that the phrase went to the absolute control and dominion of the holder. The phrase distinguished payable-on-death accounts from *inter vivos* gifts. *Gubala*, 81 Ill. App. 2d at 382, 225 N.E.2d at 649; *Johnson*, 118 Ill. App. 2d at 83, 254 N.E.2d at 599. In order for an *inter vivos* gift to become legally effective, a transaction must be fully consummated during the life of the donor. *Dudley v. Uptown National Bank of Moline*, 25 Ill. App. 2d 514, 521, 167 N.E.2d 257, 261 (1960). In contrast, payable-on-death accounts were found to be testamentary and did not require delivery. *Gubala*, 81 Ill. App. 2d at 382, 225 N.E.2d at 649.

¶ 28   Thus, the phrase ensured that no constraints would be made on the holder's intended disposition. Illinois courts interpreting the Illinois Savings and Loan Act established:

> " 'The disposition of funds in a "[payable-on-death] account" is clearly testamentary, not inter vivos, in nature. In order for there to be an inter vivos gift the donor must have donative intent, he must part with exclusive dominion and control over the subject matter and there must be a delivery. *Frey v. Wubbena*, 26 Ill2d 62, 185 NE2d 850. The beneficiary of a "[payable-on-death] account" cannot withdraw any of the money prior

-6-

to the owner's death and has no legal redress to protect himself against a wasteful dissipation of the funds by the owner. In effect, his interest comes into being only at the owner's death. The owner of a "[payable-on-death] account" therefore does not, during his lifetime, part with exclusive dominion and control over the funds therein.' " *Johnson*, 118 Ill. App. 2d at 83-84, 254 N.E.2d at 599 (quoting *Gubala*, 81 Ill. App. 2d at 382-83, 225 N.E.2d at 649-50).

¶ 29 Put simply, the phrase originates from an attempt to remove restraints on a holder's control of the account "during his or her lifetime." The use of the phrase "during his lifetime" in the Restatement called for courts to respect the "manifestation of intent" of the holder. The same phrase in the Illinois Savings and Loan Act expressed the "exclusive control and dominion" of the holder. Interpreting this phrase as a restriction on the holder's intent, and requiring the formal acceptance to occur before the holder's death, runs contrary to these origins.

¶ 30 The phrase "during his or her lifetime" has not been specifically addressed in the context of section 4. Nonetheless, the few precedents interpreting the Act have found that the policy behind the statutory scheme is to effectuate the intent of the holder. *Cotton v. First State Bank of Mendota*, 182 Ill. App. 3d 400, 402, 537 N.E.2d 1103, 1105 (1989); *In re Estate of Weiland*, 338 Ill. App. 3d 585, 602, 788 N.E.2d 811, 826 (2003); *Gonzalez v. Second Federal Savings & Loan Ass'n*, 2011 IL App (1st) 102297, ¶ 47, 954 N.E.2d 245. In *Cotton*, the holder of the account was found to have revoked a payable-on-death provision for an account in December 1984, before the Act took effect. In *Cotton*, the bank called the holder, a 92-year-old aunt of the named beneficiary, after becoming suspicious that her niece was exerting undue influence. After the holder stated that she did not want to name anyone as a beneficiary, a bank employee whitened out the payable-on-death provision on the certificate.

¶ 31 *Cotton* found that the bank had no obligation to consult with the beneficiary about the change. *Cotton* noted that Illinois courts had already established that holders of such accounts have the absolute right to alter or remove payable-on-death provisions. *Cotton*, 182 Ill. App. 3d at 402-03, 537 N.E.2d at 1105 (citing *Gubala*, 81 Ill. App. 2d at 382-83, 225 N.E.2d at 649-50). *Cotton* concluded that this was consistent with the recently enacted paragraph 4(a):

"To hold that a third-party beneficiary must be informed of changes in a payable-on-death account would mean that the owner could not change the account without contacting the beneficiary. This runs counter to the well-established rule of law that the owner of a payable-on-death account has exclusive dominion and control over the funds of the account during her lifetime. Additionally, this court notes that the legislature, subsequent to the occurrences in this case, clarified the notice issue by stating that the holder of a payable-on-death account may change the designated beneficiaries without the consent or knowledge of such persons. Ill. Rev. Stat. 1987, ch. 17, par. 2134(a)." *Cotton*, 182 Ill. App. 3d at 402-03, 537 N.E.2d at 1105.

¶ 32 In *Weiland*, the holder's failure to sign a signature card did not invalidate the creation of a payable-on-death account. After quoting paragraph 4 in its entirety, *Weiland* noted as follows:

"While section 4 of the Act requires a signed agreement evincing the intent of the holder

to create a POD account, nothing in the Act specifies the form that the agreement must take. Indeed, it is well established that it is the intent of the account holder, not the form of the written agreement, that governs whether the holder intended to establish a POD account." *Weiland*, 338 Ill. App. 3d at 603, 788 N.E.2d at 826-27.

¶ 33    Following *Weiland*, *Gonzalez* found that a holder need not alter or sign a signature card in order to change the designation of beneficiaries. Essentially, *Gonzalez* applied the rationale behind *Weiland* to changes under paragraph 4(a). *Gonzalez* noted that a written instrument executed by the holder creates a presumption that the holder intended to create such an account. *Gonzalez*, 2011 IL App (1st) 102297, ¶ 47, 954 N.E.2d 245 (quoting *Weiland*, 338 Ill. App. 3d at 598, 788 N.E.2d at 822). *Gonzalez* rejected the argument that the signature cards were the only documents that could demonstrate the change of beneficiaries. After all, the Act does not specify the form of written instrument needed for change, only that it is accepted by the financial institution. Thus, when the bank allowed funds to be withdrawn from the accounts based on the holder having crossed out and written new beneficiaries directly on the certificates, the actions were " 'a written instrument accepted by the institution.' " *Gonzalez*, 2011 IL App (1st) 102297, ¶ 51, 954 N.E.2d 245.

¶ 34    *Gonzalez*, as with *Weiland* and *Cotton* before it, was guided by the policy of effectuating the intent of the holder. Moreover, *Gonzalez* rested on the understanding that the phrase "accepted by" went to form, not timing. *Gonzalez* held that the bank was responsible for the change it had acknowledged, but this also meant that the propriety of the document requesting change is determined by whether the financial institution actually accepted the instrument.

¶ 35    This leads to the justification the trial court gave for interpreting the Act as requiring the change to be accepted by the interpleader before Malinda's death. The trial court reasoned that the Act was intended to protect financial institutions, as well as the intent of holders, by respecting only written instruments that are actually accepted before a holder's moment of death–a bright-line test. Such a directive is not warranted by the use of the term "accepted." Moreover, imposing such a bright-line test would run counter to the ordinary care of accounts and, rather than protecting, would actually restrict financial institutions.

¶ 36    Historically, Totten trusts were controversial because they allowed for testamentary exchanges without the verifying requirements of the statute of wills. 17 Robert S. Hunter, Illinois Practice § 38:1 (4th ed. 2007) ("The nature of the payable on death account"). Illinois allowed such accounts because the intentions of a decedent were protected as long as the holder entered into a written agreement with the financial institution to create such an account. *Petralia*, 32 Ill. 2d at 137, 204 N.E.2d at 3; *Gubala*, 81 Ill. App. 2d at 382, 225 N.E.2d at 649. Likewise, a request for change of beneficiaries must be in a written form acceptable by the financial institution. This protection has no logical connection with requiring the actual acceptance by the institution before the decedent passes. In other words, the requirement that the request for change is "accepted by the institution" goes to form, not to timing.

¶ 37    In essence, defendants assert that the Act instructs financial institutions of a bright-line test for the time of acceptance. Paragraph 4(a) is not grammatically structured as such an

instruction. Unlike other sections of the Act, paragraph 4(a) is structured as instruction to the holder of an account, and not to financial institutions. In paragraph 4(a), the holder is the actor who "may change" the account, and the financial institution, which the written instrument may be "accepted by," is passive.

¶ 38    The grammatical structure of paragraph 4(a) indicates that the timeline "during his or her lifetime" addresses only the actions of the holder, but confusion arises because the measurement of acceptability is in the past tense–as "accepted." The flexibility of the Act, and the policy of protecting financial institutions, explains the use of the past tense. By allowing a change of designated beneficiaries through any form "accepted" by the institution, the Act leaves the form of acceptable document to the discretion of the financial institution. Thus, as in *Gonzalez*, a financial institution may become liable for any instrument it accepted, but the form of the acceptable document is left to the discretion of the institution.

¶ 39    This is consistent with the policy of the Act. The types of accounts that may be structured as payable on death under the Act vary broadly, ranging from credit union shares to certificates of deposits. 205 ILCS 625/2(b) (West 2010). As such, the forms of written instrument used to change the diverse types of accounts inevitably will vary. By recognizing the propriety of any "written instrument accepted by the institution," the Act allows for such flexibility. Adding a bright-line test requiring a financial institution to accept the request before the holder dies would not enhance this policy.

¶ 40    In the end, the facial ambiguity of the Act arises from the legislature's use of time-based terms "during his or her lifetime" and "accepted" for reasons other than establishing a bright-line test for the time beneficiaries may be changed. This does not mean that the legislature did not contemplate financial institutions being faced with documents submitted after the death of their clients. The legislature addressed such dilemmas by enacting the Uniform Commercial Code–Bank Deposits and Collections (810 ILCS 5/4-101 to 4-504 (West 2010)).

¶ 41    The Uniform Commercial Code instructs financial institutions, such as the interpleader, of their authority and responsibility in situations where the holder of an account dies after forwarding otherwise acceptable documents. The Uniform Commercial Code provides:

> "§ 4-405. Death or incompetence of customer.
>
> (a) A payor or collecting bank's authority to accept, pay, or collect an item or to account for proceeds of its collection, if otherwise effective, is not rendered ineffective by incompetence of a customer of either bank existing at the time the item is issued or its collection is undertaken if the bank does not know of an adjudication of incompetence. Neither death nor incompetence of a customer revokes the authority to accept, pay, collect, or account until the bank knows of the fact of death or of an adjudication of incompetence and has reasonable opportunity to act on it.
>
> (b) Even with knowledge, a bank may for 10 days after the date of death pay or certify checks drawn on or before that date unless ordered to stop payment by a person claiming an interest in the account." 810 ILCS 5/4-405 (West 2010).

This provision of the Uniform Commercial Code specifically addresses the situation at hand and informs the authority of the interpleader. The interpleader had the authority to accept the items presented by Malinda before knowing the fact of her death.

¶ 42 The Uniform Commercial Code complements the requirements for distribution under the Act. Section 10 of the Act controls the distribution of funds of a payable-on-death account. 205 ILCS 625/10 (West 2010). Section 10 provides that a financial institution is not required to distribute assets until presented with legal evidence of the death of the holder and proper requests by beneficiaries. 205 ILCS 625/10 (West 2010). Moreover, the Act protects a financial institution for payments made prior to the receipt of a notice of an adverse claim. 205 ILCS 625/5 (West 2010). Authorizing a financial institution to accept requests for change presented by a holder prior to her death pursuant to the Uniform Commercial Code allows financial institutions to effectuate the intent of the holder while not inhibiting the procedure for distribution under the Act. Furthermore, this clarifies that paragraph 4(a) gives holders absolute control over the designation of beneficiaries, while paragraph 4(c) addresses survivorship issues. 205 ILCS 625/4(a), (c) (West 2010). In conjunction, the Act and the Uniform Commercial Code allow financial institutions to respond in good faith to the manifested intentions of their clients.

¶ 43 The clarity of the Uniform Commercial Code, and its effective coordination with the provisions for distribution of the Act, also resolves one further concern that would otherwise be more problematic. On appeal, Belinda argues, in the alternative, that even if the documents submitted by Malinda could not change the beneficiaries, the payable-on-death provisions were effectively revoked. The argument that, for the purposes of the Act, the interpleader created new certificates of deposit is of dubious merit. Although new numbers were assigned to the certificates, the signature cards and confirmations of deposit remained the date of creation of the accounts–October 12, 2010. In any event, the Uniform Commercial Code gives financial institutions the right to accept, and account, for a reasonable time after the death of a client, and Malinda instructed the interpleader through precise written instruments.

¶ 44 Summary judgment in favor of defendant Chanslers is unwarranted. The interpleader had authority to accept the written instruments from Malinda. On remand, if the trial court determines that the interpleader accepted the written instruments, then the change of beneficiaries was effective under the Act and the interpleader is not subject to liability for having accepted the instruments.

¶ 45 Accordingly, the order of the circuit court of Hamilton County is hereby reversed and the matter is remanded with directions.

¶ 46 Reversed and remanded with directions.